# Syllabus

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

### CRAMER v TRANSITIONAL HEALTH SERVICES OF WAYNE

Docket No. 163559. Argued December 8, 2022 (Calendar No. 3). Decided July 28, 2023.

Agnes N. Cramer petitioned for workers' compensation benefits for the alleged physical and mental injuries she sustained after suffering an electrical shock and falling from a ladder while working for Transitional Health Services of Wayne, which was insured by American Zurich Insurance Company. Plaintiff asserted that, as a result of the shock and fall, she injured her right shoulder and suffered from post-traumatic stress disorder (PTSD) and non-epileptic seizures. The magistrate denied benefits for plaintiff's PTSD/non-epileptic seizure claim, finding that there was insufficient evidence that the disability was work-related. Applying the four-factor test set forth in *Martin v Pontiac Sch Dist*, 2001 ACO 118, the magistrate concluded that plaintiff failed to meet her burden of proof that her employment contributed to or accelerated her mental injuries in a significant manner as required by MCL 418.301(2) of the Worker's Disability Compensation Act (MWDCA), MCL 418.101 *et seq*. The magistrate also denied wage-loss benefits on the basis that, although plaintiff was physically disabled from the injury to her shoulder, there was no evidence that plaintiff had made a good-faith effort to secure other employment. Plaintiff appealed the magistrate's ruling to the Michigan Compensation Appellate Commission, questioning whether *Martin* was consistent with MCL 418.301(2). The commission affirmed the magistrate's denial of benefits for mental/emotional problems, concluding that (1) the magistrate correctly determined that the workplace incident did not significantly contribute to plaintiff's emotional difficulties; (2) the magistrate's determination that plaintiff's emotional problems were not work-related was supported by competent, material, and substantial evidence; (3) the magistrate applied the correct analysis to find that plaintiff had no organic neurologic problems and that the magistrate's finding in that regard was supported by competent, material, and substantial evidence; and (4) *Martin* was binding in cases applying MCL 418.301(2). However, the commission reversed the magistrate's denial of wage-loss benefits for plaintiff's shoulder injury. Plaintiff and defendants separately sought leave to appeal in the Court of Appeals. In Court of Appeals Docket No. 347745, the Court of Appeals denied defendants' application for lack of merit in the grounds presented. In Docket No. 347806, the Court of Appeals remanded the matter to the Board of Magistrates for a determination of whether plaintiff was entitled to a discretionary award of attorney fees on unpaid medical benefits; the Court denied the remainder of the application for lack of merit in the grounds presented. Plaintiff sought leave to appeal that order in the Supreme Court. In lieu of granting the application, the Supreme Court remanded the case to the Court of Appeals for consideration as on leave granted. 505 Mich 1022 (2022). In a split opinion, the Court of Appeals, JANSEN and

BECKERING, JJ. (SHAPIRO, P.J., dissenting), affirmed the commission. In addressing the questions as posed in the Supreme Court order, the Court of Appeals held that (1) the commission correctly concluded that the magistrate had properly applied both the four-factor *Martin* test and the standard set forth in *Yost v Detroit Bd of Ed*, 2001 Mich ACO 118; (2) *Martin* was not at odds with the rule that the presence of a preexisting condition is not a bar to eligibility for MWDCA benefits and does not conflict with MCL 418.301(2); and (3) the commission correctly concluded the record contained competent, substantial, and material evidence to support the magistrate's finding of a lack of causation. 338 Mich App 603 (2021). Plaintiff sought leave to appeal in the Supreme Court, and the Supreme Court granted the application, limited to two issues: (1) whether the four-factor test in *Martin* is at odds with the principle that a preexisting condition is not a bar to eligibility for workers' compensation benefits and conflicts with the plain meaning of MCL 418.301(2), and (2) assuming that *Martin* provides the appropriate test, whether the Court of Appeals erred by affirming the commission's conclusion that the magistrate properly applied *Martin* as well as the standard in *Yost*. 509 Mich 871 (2022).

In an opinion by Chief Justice CLEMENT, joined by Justices BERNSTEIN, CAVANAGH, and WELCH, the Supreme Court *held*:

MCL 418.301(2) provides that mental disabilities and conditions of the aging process, including but not limited to heart and cardiovascular conditions and degenerative arthritis, are compensable if contributed to or aggravated or accelerated by the employment in a significant manner. *Martin* was overruled to the extent it established an exclusive test, in place of a totality-of-the-circumstances analysis, because that test was contrary to MCL 418.301(2) and imposed a higher burden on claimants than the statute requires. The Court adopted a clarified version of the test set forth in *Farrington v Total Petroleum, Inc*, 442 Mich 201 (1993), as the test to apply when claimants seek compensation under MCL 418.301(2). A claimant must show that their health injury was significantly caused or aggravated by employment considering the totality of all the occupational factors and all the claimant's health circumstances and nonoccupational factors. Occupational factors include: the temporal proximity of the health problem to the work experience, the physical stress to which the claimant was subjected, the conditions of employment, and the repeated return to work after each instance of a health problem; the occupational factors must be considered together with the totality of a claimant's health circumstances to analyze whether the health problem was significantly caused by work-related events. In evaluating mental injuries, all nonoccupational factors must be measured against all occupational factors to determine if the significant manner requirement is satisfied. Because the magistrate applied *Martin* in their decision, the magistrate's findings were vacated. The Court of Appeals judgment was reversed, and the case was remanded for further proceedings.

1. With regard to workers' compensation benefits, MCL 418.301(2) provides that mental disabilities and conditions of the aging process, including but not limited to heart and cardiovascular conditions and degenerative arthritis, are compensable if contributed to or aggravated or accelerated by the employment in a significant manner. Mental disabilities are compensable if arising out of actual events of employment, not unfounded perceptions thereof, and if the employee's perception of the actual events is reasonably grounded in fact or reality. Thus, to recover compensation under MCL 418.301(2) for mental injuries, a claimant must establish: (1) a mental disability, (2) that arises out of actual events of employment, and (3) that those events contributed to or aggravated the mental disability in a significant manner.

2. In determining whether a disability arising out of a workplace injury is eligible for compensation under MCL 418.301(2), the *Martin* test required the fact-finder to consider: (1) the number of occupational and nonoccupational contributors to the disability, (2) the relative amount of contribution of each contributor, (3) the duration of each contributor, and (4) the extent of permanent effect that resulted from each contributor. While *Martin* was originally designed to interpret the term "significant," it instead became the test for overall compensability. *Martin* created confusion and led to inconsistent resolution of workers' compensation claims because, while it stated that the four-factor test was not a bright-line test or checklist, it then stated that it had adopted a definition for significant contribution that could be satisfied only when the four-factor test was met, resulting in some panels adhering strictly to the four factors, while other panels considered additional factors. To the extent that *Martin* established an exclusive test, in place of a totality-of-the-circumstances analysis, that test was contrary to MCL 418.301(2) and imposed a higher burden on claimants than the statute requires. Specifically, the *Martin* test exhibited bias against finding for claimants and was problematic because courts, magistrates, and the commission functionally used *Martin* as a bright-line test, ignoring the rest of the statute and factors not enumerated by *Martin*. Moreover, *Martin* erroneously construed "*a* significant manner" to mean *the most* significant manner, in contradiction of the statutory text. In addition, the limited factors in *Martin* often tipped the scales in favor of noncompensability: although *Martin* stated that overwhelming proofs regarding one factor could overcome the absence of proof regarding another factor, the *Martin* test was not applied like that; in particular, the commission applied the test as requiring noncompensation merely because one of the four factors was absent or as allowing the disregard or minimization of evidence that did not fit under one of the four factors. The *Martin* test was overruled because it conflicted with the plain meaning of MCL 418.301(2) and was at odds with the principle that a preexisting condition is not a bar to eligibility for workers' compensation benefits.

3. In place of *Martin*, the test set forth in *Farrington* should be used. That case held that, under MCL 418.301(2), a claimant must show that their health injury was significantly caused or aggravated by employment considering the totality of all the occupational factors and the claimant's health circumstances and nonoccupational factors. Occupational factors include: the temporal proximity of the health problem to the work experience, the physical stress to which the claimant was subjected, the conditions of employment, and the repeated return to work after each instance of a health problem; this list is not all-inclusive. Stated differently, the occupational factors must be considered together with the totality of a claimant's health circumstances to analyze whether the health problem was significantly caused by work-related events. The *Farrington* test was clarified, in part, by *Lombardi v William Beaumont Hosp (On Remand)*, 199 Mich App 428 (1993), which held that the "significant manner" test requires analysis of whether the events occurring at work had more than a minor contributing, aggravating, or accelerating effect in the overall psychiatric scheme, which involves reviewing and comparing all the factors contributing to the disability, both occupational and nonoccupational; in evaluating mental injuries, all nonoccupational factors must be measured against all occupational factors to determine if the significant manner requirement is satisfied. Thus, reviewing workers' compensation claims under MCL 418.301(2) requires consideration of the totality of the circumstances, including, but not limited to, those factors discussed in *Farrington* and *Lombardi*. Under this clarified *Farrington* test, the four *Martin* factors may still be relevant in considering the totality of the circumstances—but only as part of the inquiry, not the whole inquiry.

4. Because the magistrate and the commission in this case applied the *Martin* four-factor test, the findings of the magistrate were vacated, the judgment of the Court of Appeals was reversed, and the case was remanded for further proceedings, including a redetermination applying the new clarified *Farrington* standard and MCL 418.301(2).

Magistrate's findings vacated, Court of Appeals judgment reversed, and case remanded for further proceedings.

Justice ZAHRA, joined by Justice VIVIANO, dissenting, disagreed with the majority's conclusion that *Martin*'s four-factor test conflicted with MCL 418.301(2) and was at odds with the principle that a preexisting condition is not a bar to the receipt of workers' compensation benefits. Because there was a lack of evidence supporting plaintiff's claim of developing non-epileptic seizures as a result of her accident, the case was a poor vehicle to consider altering the longstanding standards set forth in *Martin*. Further, MCL 418.861a(14) requires the judiciary to treat the commission's factual findings as conclusive in a workers' compensation case if there is any evidence supporting that decision. By premising its conclusions on facts that were not accepted by the commission, the majority's recitation of facts violated MCL 418.861a(14). In addition, none of the majority's criticisms of *Martin* was compelling. The *Martin* test was consistent with caselaw interpreting MCL 418.301(2). Indeed, the *Martin* test set forth sound guidance for determining whether occupational factors contributed in a significant manner to a claimant's existing mental disability. The majority's addition of the *Farrington* factors did not resolve any perceived conflict between *Martin* and the text of MCL 418.301(2); it also did not bolster the principle that a preexisting condition is not a bar to the receipt of benefits any more than *Martin*. In fact, the *Farrington* factors are subsumed by the *Martin* factors as applied and, when relevant, integrated into a proper application of the *Martin* test. At most, the majority should have clarified and emphasized that the four-factor test in *Martin* was not dispositive and allowed for any relevant factors to be considered, including the *Farrington* factors if applicable. The majority failed to offer a sound basis for overruling *Martin*, and in its place established a test requiring consideration of additional factors that are not very relevant to mental disability claims under MCL 418.301(2). Justice ZAHRA would have affirmed the Court of Appeals judgment affirming the commission's decision, which in turn, affirmed the magistrate's denial of benefits for plaintiff's alleged mental disability. Because it was unlikely that plaintiff would be able to establish her claim under the majority's new test, Justice ZAHRA would not have remanded the case for further proceedings and instead would have affirmed the denial of plaintiff's mental disability claim.

Justice BOLDEN did not participate in the disposition of this case because the Court considered it before she assumed office.

# OPINION

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

FILED July 28, 2023

STATE OF MICHIGAN

SUPREME COURT

AGNES N. CRAMER,

Plaintiff-Appellant,

v

No. 163559

TRANSITIONAL HEALTH SERVICES OF
WAYNE and AMERICAN ZURICH
INSURANCE COMPANY,

Defendants-Appellees.

BEFORE THE ENTIRE BENCH (except BOLDEN, J.)

CLEMENT, C.J.

This case presents two questions arising under Michigan's Worker's Disability
Compensation Act (MWDCA), MCL 418.101 *et seq*. First is whether the four-factor test
laid out in *Martin v Pontiac Sch Dist*, 2001 ACO 118, lv den 466 Mich 873 (2002), conflicts
with MCL 418.301(2). Second is whether *Martin* is at odds with the principle that a

preexisting condition is not a bar to the receipt of workers' compensation benefits. We answer both questions in the affirmative.

The test set forth in *Martin*—initially designed to be used merely as a "guide" when determining whether a plaintiff has demonstrated that their workplace injury significantly contributed to the claimed disability—has morphed into a straitjacket.[1] For more than 20 years, *Martin* has effectively replaced MCL 418.301(2), requiring plaintiffs to meet a higher burden than what the Legislature intended and enacted. *Martin*'s strict, four-factor test is routinely misapplied in workers' compensation cases, potentially depriving plaintiffs of benefits to which they may be entitled under the proper test. Today, this Court seeks to remedy this issue and ensure proper application of MCL 418.301(2) by overruling *Martin* and adopting a clarified version of the test set forth in *Farrington v Total Petroleum, Inc*, 442 Mich 201; 501 NW2d 76 (1993). Accordingly, we reverse the Court of Appeals' judgment applying the now-overruled *Martin* test and remand this case to the magistrate for consideration under the clarified *Farrington* standard.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff, Agnes Cramer, worked as the dietary manager for defendant Transitional Health Services of Wayne, a nursing care facility. In February 2012, while wiping off a light fixture with a damp rag at work at the instruction of her manager, plaintiff was

---

[1] Justice ZAHRA's dissent belabors the assertion that because *Martin* was intended to be a mere "guide" and because "its four-factor test is not dispositive," "there is not much, if any, purpose served by the action taken by the Court in this case." However, the majority's interest in taking on this case is premised on this exact point. While it's true that *Martin* was only supposed to be a guide, over the last two decades, its test has been treated as dispositive.

electrocuted and fell off a ladder. Plaintiff claimed that she hit her shoulder and head, lost consciousness, and was rushed to the hospital. Plaintiff testified that she felt disoriented in the hospital and could not walk. She complained of pain in her arm, shoulder, and head. However, finding no injury to plaintiff at that time, the hospital released plaintiff and cleared her to return to work.[2]

Plaintiff returned to work two days later but continued feeling dizzy and disoriented and left. She sought a second opinion from her family doctor, who diagnosed her with a concussion and sent her to another facility to address her complaints of shoulder pain. Plaintiff notified defendant of the concussion diagnosis, and defendant requested that plaintiff be evaluated at an outpatient, neurological medical facility. The neuro facility confirmed the concussion diagnosis, treated plaintiff for seizures, and reported that plaintiff could not return to work. Plaintiff then received an electroencephalogram (EEG) neurological examination at another clinic, but that examination yielded normal test results—even though plaintiff and her caregiver still reported six seizure events.

Plaintiff claimed that she began experiencing seizures in April 2012, about two months after her workplace fall. During this time, she began receiving treatment for seizures at the hospital, including a two-week continuous video-EEG monitoring test, which did not show any evidence of epilepsy. Critical to these proceedings, Dr. Mariana Spanaki-Varalas, a board-certified clinical neurophysiologist, determined that these were "nonepileptic" seizures, meaning they were not caused by any physical brain abnormality,

---

[2] Plaintiff's workplace accident and subsequent hospital visit occurred on Wednesday, February 8, 2012. The hospital released plaintiff that same day, and it cleared her to return to work two days later, on Friday, February 10, 2012.

3

but by stress.[3]  Dr. Spanaki-Varalas also diagnosed plaintiff with post-traumatic stress disorder (PTSD), and plaintiff also claimed to be experiencing severe headaches.  Dr. Spanaki-Varalas related plaintiff's diagnoses to the workplace accident in February 2012, and she transferred plaintiff to psychologist Andrea Thomas for treatment of her non-epileptic seizures.  Ms. Thomas stated that her Axis I diagnosis for plaintiff was conversion disorder characterized by non-epileptic seizures, and she also diagnosed plaintiff with PTSD and a major depressive disorder.  Ms. Thomas's opinion was that plaintiff's conversion disorder and PTSD were either caused or significantly aggravated by plaintiff's workplace accident in February 2012, but she was unable to provide a professional opinion as to whether plaintiff's depression was also related to the accident.

Plaintiff alleged that she remained unable to work following the accident due to her injuries.  Plaintiff also alleged that she has only driven her car once since the date of the accident because of medical restrictions from her doctors.

---

[3] When conversion disorder manifests in seizures, the seizures are referred to as non-epileptic seizures.  "Conversion disorder is a disorder in which a person experiences blindness, paralysis, or other symptoms affecting the nervous system that cannot be explained solely by a physical illness or injury.  Symptoms usually begin *suddenly* after a period of emotional or physical distress or psychological conflict."  Genetic and Rare Diseases Information Center, *Conversion Disorder* <http://rarediseases.info.nih.gov/diseases/6191/conversion-disorder> (accessed June 23, 2023) [https://perma.cc/3SZ8-6H4L] (emphasis added).  The term "nonepileptic" seizures is outdated in the medical community, and the "[c]ommonly used current terms for this phenomenon are psychogenic nonepileptic spells or seizures (PNES), psychogenic nonepileptic episodes (PNEE), or psychogenic nonepileptic attacks.  These terms reinforce the idea that the events are not epileptic seizures and are of psychiatric origin."  Huff & Murr, *Psychogenic Nonepileptic Seizures* <https://www.ncbi.nlm.nih.gov/books/NBK441871/> (accessed June 23, 2023) [https://perma.cc/WK8T-L7MT].

Plaintiff petitioned for workers' compensation benefits for the physical and mental injuries she sustained from her workplace fall. Plaintiff's claims were tried before a magistrate judge. Plaintiff and numerous experts testified before the magistrate. At that time, defendants elicited testimony from plaintiff regarding other stressors in her life that may have contributed to her seizures. Specifically, plaintiff testified that she was repeatedly physically and emotionally abused by her first husband of nineteen years. Upon divorcing her abusive husband in 2006, plaintiff was then disowned by her mother, church community, and friends—all of whom were unsupportive of the divorce for religious reasons. She also lost custody of her children. But despite these challenges, there is no evidence in the record that plaintiff had experienced seizures or took any time off work between her divorce and the workplace fall as a result of these past experiences. At the time of the accident, plaintiff had been divorced from her husband for six years and was happily remarried.

Experts testified regarding plaintiff's mental injuries. Dr. Gregory Barkley, a board-certified neurologist specializing in seizure disorders, diagnosed plaintiff with PTSD and explained that the injury physically and mentally devastated her. Dr. Spanaki-Varalas and Ms. Thomas testified as to their diagnoses of PTSD and non-epileptic seizures, and both testified that plaintiff's workplace injury significantly contributed to the development of her physical and mental injuries. Thomas additionally testified as to her diagnosis of a conversion disorder characterized by nonepileptic seizures. After treating plaintiff for more than 11 months, Thomas testified before the magistrate. The magistrate summarized Thomas's testimony as follows:

5

[The] sole causation opinion of plaintiff's current diagnosis is a work incident of February 8, 2012. If there were any other prior issues they were not evident and they were not causing her problems. The seizures began after the work incident of February 8, 2012.

Conversely, one of defendant's experts, Dr. Manfred F. Greiffenstein, a neuropsychologist, testified that plaintiff was not disabled from a psychological standpoint and that any mental health treatment she needed was not connected to the work accident. He diagnosed her with pseudo-seizures[4] and noted no cognitive difficulties. Dr. Greiffenstein opined, without reference to any of plaintiff's medical records prior to the workplace incident, that she suffers from "weaknesses in [her] personality" that had likely been around since adolescence. He dismissed a connection to the workplace incident because, in his words, if it had happened to him, he would not have been traumatized. He testified that only a life-threatening event or threat of serious physical injury would be stressful enough to be causally related to employment and that plaintiff's fall from a ladder wasn't enough to cause such a severe physical and mental response. Dr. Wilbur Boike, a neurologist who focuses on spinal injuries, agreed with the pseudo-seizure diagnosis but expressed skepticism at plaintiff's "convenient" self-reporting of symptoms.

The magistrate issued an opinion that (1) denied benefits for plaintiff's PTSD/nonepileptic-seizure claim, finding that there was insufficient evidence that the

---

[4] "Pseudoseizure is an older term for events that appear to be epileptic seizures but, in fact, do not represent the manifestation of abnormal excessive synchronous cortical activity, which defines epileptic seizures. They are not a variation of epilepsy but are of psychiatric origin. Other terms used in the past include hysterical seizures, psychogenic seizures, and others. The most standard current terminology is psychogenic nonepileptic seizures (PNES)." Huff & Murr, *Psychogenic Nonepileptic Seizures* <https://www.ncbi.nlm.nih.gov/books/NBK441871/#:~:text=Pseudoseizure%20is%20an%20older%20term,but%20are%20of%20psychiatric%20origin> (accessed June 23, 2023) [https://perma.cc/WK8T-L7MT].

disability was work-related, and (2) denied lost wages because, although plaintiff was physically disabled from the injury to her right shoulder, there was no evidence that plaintiff had made a good-faith effort to secure other employment, and thus, lost wages were denied.[5]

Relevant to the appeal before us today, the magistrate concluded plaintiff failed to meet her burden of proof that her employment "contributed to or aggravated or accelerated" her mental injuries "in a significant manner" as required by MCL 418.301(2). In determining whether the occupational contributors met the definition of "significant" in MCL 418.301(2), the magistrate applied the four-factor test set forth in *Martin*, 2001 ACO 118, considering: (1) the number of occupational and nonoccupational contributors, (2) the relative amount of contribution of each contributor, (3) the duration of each contributor, and (4) the extent of permanent effect that resulted from each contributor.

Applying *Martin* to plaintiff's claims, the magistrate first compared the sole occupational contributor of the electric shock and fall from the ladder to the nonoccupational factors of cumulative physical and mental abuse from plaintiff's prior marriage and the separation from her family, community, and children after the divorce. The magistrate concluded that these nonoccupational contributors outnumbered the occupational contributors. As for the relative duration of the contributors, the magistrate

_____

[5] The claim related to plaintiff's shoulder injury is not subject to this appeal as the magistrate's decision on that issue was reversed by the Commission and the parties did not further raise the issue. The Commission specifically reversed the portion of the magistrate's order that denied plaintiff wage-loss benefits for the shoulder injury and affirmed the remainder of the order, including the magistrate's finding that plaintiff was not entitled to workers' compensation benefits for emotional problems or organic neurologic problems.

determined that the nonoccupational stressors were continuing, whereas the work event was a one-time incident. Finally, the magistrate noted that there was no objective evidence of permanent effects to plaintiff from the workplace incident. She rejected the expert testimony presented by plaintiff's witnesses regarding causation, in part, because those experts failed to establish a hierarchy of plaintiff's nonoccupational stressors compared with her occupational stressors. The magistrate instead relied on defendant's experts, who testified there was no objective neurological abnormality accounting for plaintiff's subjective symptoms and no objective evidence of any involvement of the central nervous system due to head trauma. The magistrate also relied on the experts' testimony providing that health services were indicated for interpersonal conflicts, but that plaintiff's personal problems predate the incident. Having concluded that plaintiff failed to establish that the workplace fall contributed to her mental injuries "in a significant manner," the magistrate rejected plaintiff's PTSD/nonepileptic-seizure claim for disability benefits.

Plaintiff appealed the magistrate's ruling to the Michigan Compensation Appellate Commission (the Commission),[6] raising one issue: whether *Martin* is consistent with § 301(2) of the MWDCA, MCL 418.301(2). The Commission affirmed the magistrate's denial of benefits for mental/emotional problems, concluding: (1) that the magistrate

---

[6] Governor Gretchen Whitmer's Executive Reorganization Order No. 2019-13 created the Workers' Disability Compensation Appeals Commission to manage, process, and decide appeals from orders of the Director of the Workers' Disability Compensation Agency and the Workers' Compensation Board of Magistrates. This commission used to be called the Michigan Compensation Appellate Commission (the MCAC). At the time that the Commission rendered its decision in this case it was still called the MCAC. As the name of this body has changed over the years, this opinion simply refers to this body as "the Commission" throughout.

8

applied the proper analysis in finding that the workplace incident did not significantly contribute to plaintiff's emotional difficulties; (2) that the magistrate's determination that plaintiff's emotional problems were not work-related was supported by competent, material, and substantial evidence; (3) that the magistrate applied the correct analysis to find that plaintiff has no organic neurologic problems and that the magistrate's finding in that regard is supported by competent, material, and substantial evidence; and perhaps, most importantly (4) that *Martin* is binding in cases applying MCL 418.301(2). The Commission held that the magistrate properly applied *Martin*'s four-factor test in the analysis. Relevant to this appeal, the magistrate rejected the medical opinions of Dr. Barkley, Dr. Spanaki-Varalas, and Ms. Thomas, and instead relied on the testimony of Dr. Boike and Dr. Greiffenstein. The Commission concluded that this aspect of the magistrate's decision was supported by "competent, material, and substantial evidence and therefore must be affirmed."

All parties sought leave to appeal in the Court of Appeals.[7] The Court of Appeals denied leave for lack of merit on the issue of compensability for the mental injury.[8]

---

[7] See *Cramer v Transitional Health Servs of Wayne* (Court of Appeals Docket No. 347745) and *Cramer v Transitional Health Servs of Wayne* (Court of Appeals Docket No. 347806).

[8] The Court of Appeals order remanded the matter to the Board of Magistrates for a determination of whether plaintiff was entitled to a discretionary award of attorney fees on unpaid medical benefits; the Court denied the remainder of the application for lack of merit in the grounds presented. See *Cramer v Transitional Health Servs of Wayne*, unpublished order of the Court of Appeals, entered August 16, 2019 (Docket No. 347806). In Docket No. 347745, the Court of Appeals denied the application for leave to appeal for lack of merit in the grounds presented. *Cramer v Transitional Health Servs of Wayne*, unpublished order of the Court of Appeals, entered August 16, 2019 (Docket No. 347745). The appeal in this matter involves only the issues raised and addressed by the parties in Court of Appeals Docket No. 347806.

Plaintiff sought leave to appeal in this Court. In lieu of granting leave to appeal, the Court remanded the case to the Court of Appeals for consideration as on leave granted. *Cramer v Transitional Health Servs of Wayne*, 505 Mich 1022 (2020). The remand order instructed the Court of Appeals to consider whether

> (1) the Michigan Compensation Appellate Commission correctly concluded that the magistrate properly applied the four-factor test in *Martin v Pontiac Sch Dist*, 2001 Mich ACO 118, lv den 466 Mich 873 (2002), and the standard in *Yost v Detroit Board of Education*, 2000 Mich ACO 347, lv den 465 Mich 907 (2001); (2) the *Martin* test is at odds with the principle that a preexisting condition is not a bar to eligibility for workers' compensation benefits and conflicts with the plain meaning of MCL 418.301(2); and (3) the Michigan Compensation Appellate Commission correctly concluded that the magistrate's lack of causation conclusion was supported by the requisite competent, substantial, and material evidence utilizing the proper standard of law. [*Cramer*, 505 Mich at 1022.]

On remand, the Court of Appeals issued a split decision affirming the Commission. Writing for the majority, Judge JANSEN, joined by Judge BECKERING, held (1) the Commission correctly concluded that the magistrate had properly applied the *Martin* and *Yost* tests, (2) *Martin* is not at odds with the rule that the presence of a preexisting condition is not a bar to eligibility for MWDCA benefits and does not conflict with MCL 418.301(2), and (3) the Commission correctly concluded the record contained competent, substantial, and material evidence to support the magistrate's finding of a lack of causation. *Cramer v Transitional Health Servs of Wayne*, 338 Mich App 603, 628-630, 632-639; 980 NW2d 744 (2021). The majority endorsed the *Martin* test on the basis that it "essentially conforms with the Supreme Court's own guidance regarding how to apply" MCL 418.301(2) because it "provides for a comparison of nonemployment and employment factors." *Id.* at 638-639. According to the majority, so long as the *Martin* analysis shows that the "work stressor

10

contributed to, aggravated, or accelerated the illness in a significant manner," a preexisting condition will not bar a plaintiff from obtaining benefits. *Id*. at 639.

Judge SHAPIRO dissented. He concluded that the *Martin* test is divorced from the statutory text and is "wholly a creation of the commission," adopted without following proper rulemaking procedures. *Id*. at 647 (SHAPIRO, P.J., dissenting). Judge SHAPIRO noted that the Commission incorrectly understood the word "significant," as used in MCL 418.301(2), to mean "substantial," increasing the threshold for relief beyond what the Legislature intended. *Id*. at 647-648. Judge SHAPIRO explained that the *Martin* test is biased against compensating workers, though he acknowledged that the test's factors are not totally irrelevant to evaluating compensability under the statute, just incomplete. *Id*. at 650-651. Particularly, when there is a preexisting condition, a single workplace incident will never constitute more than one "contributor" and will therefore "never outnumber nonoccupational contributors . . . ." *Id*. at 650. Similarly, a single-event injury "can never compare in 'duration' to a preexisting condition." *Id*.

Plaintiff sought leave to appeal in this Court, and we granted the application on two limited issues: "(1) whether the four-factor test in *Martin* (a) is at odds with the principle that a preexisting condition is not a bar to eligibility for workers' compensation benefits, and (b) conflicts with the plain meaning of MCL 418.301(2); and (2) assuming that *Martin* provides the appropriate test, whether, on this record, the Court of Appeals erred in affirming the [Commission's] conclusion that the magistrate properly applied *Martin*, as well as the standard in *Yost v Detroit Bd of Ed*, 2000 Mich ACO 347, lv den 465 Mich 907 (2001)." *Cramer v Transitional Health Servs of Wayne*, 509 Mich 871 (2022) (citation omitted).

11

## II. STANDARD OF REVIEW[9]

Under MCL 418.861a(3), the Commission looks at the whole record to determine whether the magistrate's factual findings are supported by competent, material, and substantial evidence; if such support exists, the magistrate's findings of fact are considered conclusive. Substantial evidence is defined as "such evidence, considering the whole record, as a reasonable mind will accept as adequate to justify the conclusion." *Id*. When interpreting the MWDCA, this Court has explained that "the statute has been liberally construed to provide broad coverage for injured workers." *Wells v Firestone Tire & Rubber Co*, 421 Mich 641, 651; 364 NW2d 670 (1984). Judicial review of the Commission's decision is governed by MCL 418.861a(14), which provides as follows:

> The findings of fact made by the commission acting within its powers, in the absence of fraud, shall be conclusive. The court of appeals and the supreme court shall have the power to review questions of law involved with any final order of the commission, if application is made by the aggrieved party within 30 days after the order by any method permissible under the Michigan court rules.

Questions of law involved in workers' compensation cases are reviewed de novo. *Smitter v Thornapple Twp*, 494 Mich 121, 129; 833 NW2d 875 (2013). A decision of the Commission "is subject to reversal if it is based on erroneous legal reasoning or the wrong legal framework." *Ross v Modern Mirror & Glass Co*, 268 Mich App 558, 561; 710 NW2d 59 (2005). An administrative agency's interpretation of a statute is accorded respectful consideration and should not be overturned without cogent reasons. *Grass Lake*

---

[9] The plain text of MCL 418.861a(14) expressly grants this Court the power to "review questions of law involved with any final order of the commission[.]" As the majority is opining strictly on questions of law and, contrary to the dissent's claim, is not weighing in on facts absent from the record, it is acting well within its authority.

*Improvement Bd v Dep't of Environmental Quality*, 316 Mich App 356, 362-363; 891 NW2d 884 (2016).

### III. HISTORY OF THE MWDCA

When the Legislature first enacted the MWDCA, the statutory scheme referred only to "personal injury" and did not explicitly refer to mental injuries.[10] However, this Court later concluded that mental injuries were compensable as a type of personal injury. See, e.g., *Klein v Len H Darling Co*, 217 Mich 485, 487-489, 494; 187 NW 400 (1922) (holding that the decedent's death from severe emotional shock—the result of injuring a coworker and initially believing that he had killed the coworker—was compensable as accidental personal injury). In the years that followed, the Court grappled with determining which categories of mental disabilities would be compensable. Specifically, determining which conditions were "caused" by a workplace injury proved difficult. This Court later concluded that aggravation of a preexisting mental injury could be compensable under the statute. *Carter v Gen Motors Corp*, 361 Mich 577, 580-583, 591-594; 106 NW2d 105 (1960). In *Carter*, the Court held that compensation could be awarded for a mental injury that arose out of and in the course of employment because of the effects of workplace stresses on a preexisting mental injury. *Id*. In *Deziel v Difco Laboratories, Inc (After Remand)*, 403 Mich 1; 268 NW2d 1 (1978), this Court further examined the causal link that must exist between the work and the disability to receive compensation. *Deziel* established a subjective causal analysis based on the claimant's perceptions, which led to

---

[10] 1915 CL 5431 provided, in part, "If an employee . . . receives a personal injury arising out of and in the course of his employment by an employer . . . , he shall be paid compensation in the manner and to the extent hereinafter provided."

two problems. First, compensation could be awarded based on a claimant's imagined or perceived version of the events. Second, under *Deziel*, there was no need to prove causal connection between the injury and the employment events.

In 1980, ostensibly in response to *Deziel*, the Legislature amended MCL 418.301(2) to its current form. MCL 418.301(2) states, in relevant part:

> *Mental disabilities* and conditions of the aging process, including but not limited to heart and cardiovascular conditions and degenerative arthritis, *are compensable if contributed to or aggravated or accelerated by the employment in a significant manner.* Mental disabilities are compensable if arising out of actual events of employment, not unfounded perceptions thereof, and if the employee's perception of the actual events is reasonably grounded in fact or reality. [Emphasis added.]

Thus, a plaintiff claiming compensation for mental injuries under MCL 418.301(2) must "prove: (1) a mental disability; (2) which arises out of actual events of employment, not unfounded perceptions thereof; and (3) that those events contributed to or aggravated the mental disability in a significant manner." *Zgnilec v Gen Motors Corp (On Remand)*, 224 Mich App 392, 396; 568 NW2d 690 (1997). At issue in this case is whether plaintiff's workplace incident "contributed to or aggravated or accelerated [her mental disability] . . . in a *significant manner*." MCL 418.301(2) (emphasis added).

This Court has considered the boundaries of MCL 418.301(2) twice before. This Court's first significant attempt to define this statutory language occurred in *Farrington v Total Petroleum, Inc*, 442 Mich 201; 501 NW2d 76 (1993). There, the plaintiff, a 49-year-old employee, received workers' compensation benefits after suffering several on-the-job heart attacks. *Id*. at 204-206. The Court affirmed the award of benefits, explaining that MCL 418.301(2) required the plaintiff to show that his heart injury was "significantly

14

caused or aggravated by employment considering the totality of all the occupational factors and the claimant's health circumstances and nonoccupational factors." *Id*. at 216-217. This Court outlined occupational factors that must be weighed when evaluating the "significant manner" requirement under MCL 418.301(2). Those factors included: "the temporal proximity of the . . . [health problem] to the work experience, the physical stress to which the plaintiff was subjected, the conditions of employment, and the repeated return to work after each [instance of a health problem]." *Id*. at 221. However, the Court noted that these factors were "not all inclusive," specifically directing that, "[a]fter the enactment of the 'significant manner' amendments, these occupational factors must now be considered together with the totality of claimant's health circumstances to analyze whether the heart injury was significantly caused by work-related events." *Id*. at 221-222.

Later, in *Gardner v Van Buren Pub Sch*, 445 Mich 23, 47; 517 NW2d 1 (1994), overruled on other grounds by *Robertson v DaimlerChrysler Corp*, 465 Mich 732; 641 NW2d 567 (2002),[11] this Court built upon its ruling in *Farrington* for a claim premised on

---

[11] The *Robertson* Court questioned the idea that individuals with mental injuries or disabilities could, in many cases, "misperceive or altogether lose contact with reality." *Robertson*, 465 Mich at 751. The *Robertson* Court noted that *Gardner* took a broad view of this by reasoning that "it would be 'absurd' to allow compensation for a mental disability injury resulting from an actual event of employment only to subsequently 'exclude[] the vast majority of all mental disabilities [which are often] based on unfounded perceptions of actual events.' " *Id*. (first alteration in original), quoting *Gardner*, 445 Mich at 44. Addressing *Gardner* further, this Court stated:

> [T]o satisfy the mental disability requirements of the second sentence of [MCL 418.301(2)], a claimant must demonstrate: (a) that there has been an actual employment event leading to his disability, that is, that the event in question occurred in connection with employment and actually took place; and (b) that the claimant's perception of such actual employment event was not unfounded, that is, that such perception or apprehension was grounded in fact or reality, not in the delusion or the imagination of an impaired mind.

15

a mental disability. *Gardner* held that when evaluating mental injuries, all nonoccupational factors must be measured against all occupational factors to determine if the significant-manner requirement of MCL 418.301(2) is satisfied. *Gardner* emphasized that employers must "take employees as they find them, with all preexisting mental and physical frailties." *Gardner*, 445 Mich at 48. The *Gardner* Court specifically concluded that when evaluating whether a disability is compensable, the issue is not whether a reasonably healthy person would have been injured under the circumstances. Instead, "[i]t is whether a specific individual, regardless of preexisting conditions, sustained an injury that arose out of, and in the course of employment." *Id*. The Court recognized that, "[a]bsent an explicit legislative mandate, mental disabilities should not be treated differently [than physical injuries]." *Id*. at 48-49.

Also relevant is a portion of a pre-*Gardner* opinion from the Court of Appeals—*Lombardi v William Beaumont Hosp (On Remand)*, 199 Mich App 428; 502 NW2d 736 (1993)—in which an individual sought compensation for a psychiatric disability that he argued was the result of "repeated verbal and physical abuse on the job from co-workers and supervisors." *Id*. at 429. Regarding the "significant manner" criteria in MCL 418.301(2), the Court of Appeals opined:

> Because significance is a relative concept, the significant manner test requires an analysis whether the events occurring at work had more than a minor contributing, aggravating, or accelerating *effect in the overall psychiatric scheme*. This necessarily involves a review and comparison of all the factors contributing to disability, both occupational and non-occupational. [*Id*. at 435-436 (emphasis added, citations omitted).]

---

To the extent that *Gardner* is inconsistent with this interpretation of [MCL 418.301(2)], we overrule it. [*Robertson*, 465 Mich at 752-753.]

16

The Court of Appeals remanded the case to the Workers' Compensation Appeal Board due, in part, to the board's failure to consider or weigh nonoccupational factors that could have contributed to the plaintiff's disability. *Id*. at 436.

In *Yost*, 2000 Mich ACO 347, the Commission further explored preexisting conditions under MCL 418.301(2). The Commission rejected the plaintiff's argument that, despite her preexisting health conditions, her workplace injury was compensable merely because it was the " 'last straw' " that caused her mental and physical injuries. *Id*. at 6. *Yost* concluded that the plaintiff's argument was unavailing and conflicted with MCL 418.301(2). See *id*. at 2 & n 2. Specifically, the Commission determined that the last factor in a given causal chain does not *automatically* qualify as "significant" under the statute, simply because it came last. *Id*. at 5, 6. Nothing more, nothing less. In short, not every "last straw" workplace incident will be automatically compensable:

> Evidence of structural change or a mere shift from asymptomatic status to symptomatic status is never enough, standing alone, to demonstrate significant contribution, because a pre-existing condition might be so severe that a minor, insignificant workplace event pushes the employee over the edge into a symptomatic condition, providing merely the 'last straw breaking the camel's back.' The full extent of the underlying pre-existing condition must be understood when determining whether the workplace injury significantly contributed to a disabling condition. [*Id*. at 6.]

If that were not the case, said the Commission, the "significant factor" language would be stripped of all meaning, and MCL 418.301(2) would become more or less "identical to the regular 'any contribution' standard otherwise applicable [under MCL 418.300 *et seq*. of the MWDCA]." *Id*. at 2 n 2. *Yost* requires more than a quick glance at the order of events; it requires the fact-finder to consider the totality of the circumstances— including, specifically, temporal proximity and severity of the injury.

17

Despite this Court's holdings in *Farrington* and *Gardner*, the Court of Appeals' decision in *Lombardi*, and the Commission's decision in *Yost*, magistrate judges and the Commission struggled to uniformly apply MCL 418.301(2). In an attempt to provide greater consistency, the Commission issued an en banc decision[12] setting forth the "*Martin* test." In *Martin*, the Commission addressed how to interpret the "significant manner" language from MCL 418.301(2). In determining whether a disability arising out of a workplace injury is eligible for compensation, the four-factor *Martin* test requires the fact-finder to consider: "1) the number of occupational and non-occupational contributors [to the disability], 2) the relative amount of contribution of each contributor, 3) the duration of each contributor, and 4) the extent of permanent effect that resulted from each contributor." *Martin*, 2001 Mich ACO 118, p 16. While *Martin* was originally designed to interpret the term "significant," it has become the touchstone for overall compensability.

However, this four-factor test was not intended to be dispositive. The *Martin* Commission specified:

> [W]e avoid creating a bright-line test or checklist. Instead, we propose factors which concentrate the analysis on the fundamental evidence regarding increased contribution. We prefer factors because factors differ from elements. Each element requires a preponderance of proof. Factors do not require such proof. Rather, overwhelming proofs regarding one factor can overcome the absence of proof regarding another factor. [*Id.* at 12.]

---

[12] This is especially significant because en banc Commission decisions serve as binding precedent on other Commission panels under MCL 418.274(3) ("Any matter that is to be reviewed by the commission that may establish a precedent with regard to worker's compensation in this state as determined by the chairperson, or any matter that 2 or more members of the commission request be reviewed by the entire commission, shall be reviewed and decided by the entire commission.").

But the Commission then contradicted itself. After stating that the *Martin* factors are not supposed to be a "bright-line test or checklist," the Commission declared, "we have adopted a definition for significant contribution that can be satisfied *only* when a four-factor test is met," and then restated the factors. *Id*. at 15-16 (emphasis added). *Martin*'s conflicting characterization of its test has resulted in widespread confusion and inconsistency in resolving workers' compensation claims, as some Commission panels strictly adhere to considering only the four factors, while others consider additional factors.[13]

## IV. THE *MARTIN* TEST

*Martin* and its inconsistency had remained confined to the Commission and its panels until the present case, when the Court of Appeals affirmed that *Martin* created an exclusive test. We disagree and now hold that, insofar as *Martin* established an exclusive test, in place of a totality-of-the-circumstances analysis, that test is contrary to MCL 418.301(2) and imposes a higher burden on claimants than the statute requires.[14]

---

[13] In this case, the Commission concluded that the *Martin* test is binding and exclusive when applying MCL 418.301(2). *Cramer v Transitional Health Servs of Wayne*, 2019 Mich ACO 4, p 11. However, other panels have considered it a nonbinding guide. See, e.g., *Dortch v Yellow Transp, Inc*, 2007 ACO 21, p 4.

[14] The Court of Appeals opinion stated, "While we do not conclude that there are grounds to overturn *Martin*, we acknowledge that magistrates and the [Commission] should always remain cognizant that there can be more than one contributor or group of contributors affecting a mental disability 'in a significant manner' and that the *Martin* test is only a guide to aid in the fact-finding process." *Cramer*, 338 Mich App at 643. The majority finds this reasoning to be internally inconsistent in the same way as *Martin*. Either the test is exclusive, and all the factors *must* be met, or it's a nonexclusive guide; it cannot simultaneously be both.

The *Martin* test requires a comparative analysis of the four identified factors when deciding whether an employee's work has significantly contributed to, aggravated, or accelerated a mental disability. Generally, "[w]hen the non-occupational contributors outnumber the importance of various occupational contributors," a worker's claim for disability benefits will likely fail. *Martin*, 2001 Mich ACO 118, p 12. Under *Martin*, "significant contribution requires more than minimal contribution," but " 'significant' does not require a preponderance standard where work contributors in combination with any natural progression of the condition accelerate the condition more than non-work contributors." *Id*.

The *Martin* test, in both theory and practice, exhibits bias against finding for plaintiffs and is problematic for three reasons. First, *Martin*'s test does not reflect the statutory language. Although *Martin* was only supposed to define the term "significant" as used in MCL 418.301(2), it is functionally being used by courts, magistrates, and the Commission as the start and end of the analysis, with fact-finders ignoring the rest of the statute and factors not enumerated by *Martin*. In particular, the test erroneously construes the statutory language "*a* significant manner" to mean *the most* significant manner, in total contradiction of the statutory text. However, MCL 418.301(2) permits compensation for mental injuries if the employment contributes to, or aggravates, or accelerates the injury "in *a* significant manner." (Emphasis added.)

This Court has previously emphasized the difference between "a" and "the" for purposes of statutory interpretation. For example, in *Paige v Sterling Heights*, 476 Mich 495, 507-508; 720 NW2d 219 (2006), this Court stated:

20

Traditionally in our law, to say nothing of our classrooms, we have recognized the difference between "the" and "a." "The" is defined as "definite article. 1. (used, esp. before a noun, with a specifying or particularizing effect, as opposed to the indefinite or generalizing force of the indefinite article a or an) . . . ." *Random House Webster's College Dictionary*, p 1382. Further, we must follow these distinctions between "a" and "the" as the Legislature has directed that "all words and phrases shall be construed and understood according to the common and approved usage of the language . . . .["] MCL 8.3a[.] [Quotation marks and citation omitted.]

Under this logic, it must follow that, as used in MCL 418.301(2), the phrase "*a* significant manner" cannot be understood to mean "*the most* significant manner."

*Martin*'s contorted reading of the statute was highlighted in *Taig v Gen Motors Corp*, 2006 Mich ACO 134, for example. There, the Commission criticized *Martin*'s requirement that the claimant prove that the workplace was " 'the most significant' " cause of the disability. *Id*. at 13. The *Taig* panel explained:

[*Martin*] creates a legal standard far a field [sic] from the one envisioned by MCL 418.301(2). *Martin* fails to recognize that there can be more than one significant contributing factor in a compensable condition. . . .

* * *

. . . [I]f the work-related conditions are found not to have aggravated the condition "in a significant manner" because some other condition is more significant, this is legal error because it alters the legislative scheme of "in a significant manner" into requiring the employment conditions be "the most significant" cause of the injury before it will be found to be compensable. This is precisely the kind of shift in policy that is not the role of the administrative agency to make.

. . . [T]he obligation here is to interpret MCL 418.301(2) according to its plain language. Any issues relating to the soundness of the policy underlying the statute or its practical ramifications are properly directed to the Legislature. To follow *Martin* is to "rewrite the plain statutory language and substitute our own policy decisions for those already made by the Legislature." [*Id*. at 11-13 (citations omitted).]

21

If the Legislature intended the phrase "in a significant manner" to be understood as "the most significant manner," it would have so provided. The Legislature did not do so however, and *Martin*'s requirement to construe the statute as such is erroneous.[15]

Second, as evidenced by the magistrate, the Commission, and the Court of Appeals panel here, *Martin* is being treated as a bright-line test, as opposed to the "guide" it was intended to be. See, e.g., *Bolden v DaimlerChrysler Corp*, 2006 Mich ACO 170, p 7 ("*Martin* is not, in our view, a bright line test for compensability in conditions of the aging process."); *Dortch v Yellow Transp, Inc*, 2007 Mich ACO 21, p 4 ("We repeat our previous caution that the factors enumerated in *Martin* should act as merely guides, aiding the fact finder in their often difficult task of weighing the evidence before them, and *not as a Bright-Line test*.") (emphasis added); *Jones-Stott v Henry Ford Hosp*, 2007 Mich ACO 31, p 6 ("[W]e continue to believe that *Martin . . . is not a bright line test* but it can be a useful tool in some cases involving the aging process.") (emphasis added).

Finally, the limited factors themselves often tip the scales in favor of noncompensability. Factors one and three are most problematic and inherently biased against plaintiffs. Contrary to *Martin*'s assertion that "overwhelming proofs regarding one factor can overcome the absence of proof regarding another factor," *Martin*, 2001 ACO

---

[15] Compare MCL 712B.3(*l*) ("[T]he Indian child's tribe is the tribe with which the Indian child has *the most significant contacts*.") (emphasis added); MCL 700.7107 (twice using "the most significant" relationship when describing the law of the jurisdiction designations and the absence of such a designation in trusts); MCL 722.26d(b) ("[T]he action shall be filed in the circuit court in the county having *the most significant* connection with the child.") (emphasis added); and *Paige*, 476 Mich at 499 (holding that the phrase "the proximate cause" in MCL 418.375(2) means "the sole proximate cause"), with *Doe v Dep't of Corrections*, 312 Mich App 97, 107-108; 878 NW2d 293 (2015) (holding that the phrase "a prisoner" in MCL 600.5507(2) applies to all prisoners rather than only indigent prisoners), vacated in part on other grounds 499 Mich 886 (2016).

22

118, p 12, application of the test in *Martin* and subsequent cases has been rigid and formulaic. Application of the *Martin* test has conflicted with the statutory scheme to the extent that the Commission has read the test as requiring noncompensation merely because one of the four factors is absent or as allowing the disregard or minimization of evidence that does not neatly fit under one of the four factors.

The first factor involves the raw counting of the number of occupational and nonoccupational stressors. Here, as in most cases, the number of nonoccupational stressors are greater in number than the occupational stressors because workplace injuries resulting in workers' compensation claims usually involve a one-time accident. A person can understandably acquire several stressors throughout the course of their life before their workplace accident. We agree with the dissent that nonoccupational factors are relevant. However, under the current application of *Martin*, more nonoccupational factors points toward noncompensability as a result of raw mathematics. This puts a thumb on the scale in favor of noncompensability in a way that MCL 418.301(2) does not require or permit.

The second factor of the *Martin* test requires quantifying the relative amount of contribution, acceleration, or aggravation of each factor. While we decline to comment on how the magistrate and Commission applied this factor in this case, more general commentary is warranted. Experts are not required to present their testimony in the form of a hierarchical analysis of the contribution, acceleration, or aggravation of each occupational and nonoccupational factor. Even under *Martin*, such weighing and analysis is the job of the magistrate and the Commission based on the evidence, not medical experts who provide testimony and medical opinions. Nonphysical workplace-injury disputes will typically involve competing testimony from medical experts and potentially conflicting

23

medical records, which puts the reliability and veracity of experts at issue. Magistrates and the Commission must remain cognizant of the area of expertise and experience of testifying experts, and whether they have experience dealing with the specific neurological or psychological conditions that are allegedly at issue when determining the reliability and the veracity of expert testimony.[16]

The third factor looks at the "duration of each contributor," *Martin*, 2001 ACO 118, p 16, with longer duration indicating higher contribution. Like the first, this factor tends to generate findings of noncompensability any time a plaintiff suffers from a longstanding preexisting condition. Placing too much weight on the duration of a preexisting condition or contributor risks writing "aggravat[ion]" out of MCL 418.301(2).[17]

*Martin*'s fourth and final factor is "whether any permanent effect resulted from any contributor." *Martin*, 2001 ACO 118, p 13. Thus, the magistrate must evaluate the ability of medical treatment, including rest and abstaining from work, to reverse the effect of the

---

[16] Although Mich Admin Code, R 418.97(3) does not require expert testimony to satisfy *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993), in many ways magistrates and the Commission must still fulfill the same gatekeeper function as circuit courts do when considering the reliability of proposed expert evidence under MRE 702. See Rule 418.97(1) ("Except as provided in these rules, the Michigan rules of evidence, as applied in a civil case in circuit court, must be followed in all proceedings as far as practicable, but a magistrate may admit and give probative effect to evidence of a type commonly relied upon by reasonably prudent persons in the conduct of their affairs.").

[17] Much of Justice ZAHRA's dissent revisits the facts, with an unnecessary focus on the various family-related hardships plaintiff experienced before her workplace fall. We do not dispute the existence of these hardships. However, the dissent fails to recognize that the record lacks any evidence that plaintiff ever missed work, was diagnosed with any serious or disabling mental illness, or was affected in any other way as a result of these prior hardships. Plaintiff's employment-related complaints began *after* the accident.

contributor. "In those instances where the contributors can be separated, the more lasting effect produces greater significance." *Id*. at 13. In some matters, the lack of objective neurological evidence will be dispositive, but some compensable psychological issues will not present neurological symptoms. When dealing with disputes about such issues, magistrates and the Commission must give due weight to the technical medical opinions of qualified experts. It is not proper to disregard a valid medical diagnosis on the basis that there are no objective neurological symptoms if it is well-accepted within the medical community that the condition at issue does not present neurological symptoms.

We agree with plaintiff and the Court of Appeals dissent that *Martin*, which had never been adopted by the courts until now and is not uniformly applied by every Commission panel, prevents the fair and consistent adjudication of claims seeking compensation for mental injuries under MCL 418.301(2). *Martin*'s four-factor test has disturbed the Legislature's intent and infiltrated the workers' compensation arena for far too long. It must be corrected.

## V. THE *FARRINGTON* TEST

Despite defendant's argument that *Martin* is merely a "guide," the magistrate's and Commission's analysis below—as is often the case in workers' compensation cases— begins and ends with *Martin*. This case illustrates the frequent problem of treating *Martin* as dispositive in denying plaintiffs benefits. We conclude that the test in *Farrington* more appropriately reflects the text of MCL 418.301(2).

Under the *Farrington* standard, plaintiff must demonstrate that her workplace fall and resulting medical problems were "significantly caused or aggravated by employment

25

considering the totality of all the occupational factors and the claimant's health circumstances and nonoccupational factors." *Farrington*, 442 Mich at 216-217. *Farrington* outlined occupational factors that must be weighed when evaluating the "significant manner" requirement, including: "the temporal proximity of the [injury] to the work experience, the physical stress to which the plaintiff was subjected, the conditions of employment, and the repeated return to work after each episode." *Id*. at 221. Depending on the circumstances, other relevant factors might include the natural history of any underlying or preexisting condition and whether the condition would have worsened naturally in the absence of occupational contributors. Finally, where mental injuries are concerned, we agree with the observation in *Lombardi* that the "significant manner" analysis must consider whether "the events occurring at work had more than a minor contributing, aggravating, or accelerating *effect in the overall psychiatric scheme*." *Lombardi*, 199 Mich App at 435 (emphasis added). However, as we stated in *Farrington*, these factors are "not all inclusive." *Farrington*, 442 Mich at 221.[18] As we ruled in *Farrington*, "[a]fter the enactment of the 'significant manner' amendments, these occupational factors must now be considered together with the totality of claimant's health circumstances to analyze whether the [mental or physical] injury was significantly caused

---

[18] The dissent mischaracterizes the majority's new test as criticizing the *Martin* factors, while simultaneously permitting their consideration under the clarified *Farrington* standard. However, to reiterate, the majority opinion today specifically takes issue with the *Martin* test being treated as dispositive, not the individual factors themselves. Thus, as explained in this part of the opinion, the test being set forth today requires that the *totality of the circumstances* be considered. Under a totality-of-the-circumstances analysis, all circumstances are to be considered, which would of course include the *Martin* factors, among the others specified herein.

by work-related events." *Id*. at 221-222. Nothing in MCL 418.301(2) suggests that the workplace factors must be the most significant cause of a mental disability for it to be compensable; there can be more than one significant contributing factor for a compensable condition to exist.

*Farrington*, as clarified today, advances a test that more closely aligns with the statute's plain text. Reviewing the totality of the circumstances, including temporal proximity and severity, realigns the test with the string of preceding cases that were temporarily swallowed by *Martin*. We are puzzled by the dissent's objection to the test that we adopt today given the acknowledgment that it is a totality-of-the-circumstances standard that allows consideration of all relevant facts. Nothing in this opinion precludes the consideration of occupational and nonoccupational factors so long as they are not counted as a matter of raw mathematics. Our opinion also does not preclude consideration of factors concerning mental illness that the medical community has deemed medically relevant.

Plaintiff's claims here were rejected on the basis that she could not prove that her workplace accident was "the most significant" cause of her mental injuries. While this conclusion was reached via the unsound application of *Martin*, it has yet to be determined whether plaintiff's claims would pass muster when applying the reinstated and clarified *Farrington* totality-of-the-circumstances standard. There is no dispute that plaintiff endured difficult challenges and tragedies in her life prior to the accident. There is also no dispute that the fall at issue here was a one-time accident. Therefore, as noted by Judge SHAPIRO in his dissent, plaintiff's single workplace incident could "never constitute more than one 'contributor' and . . . [could] never outnumber nonoccupational contributors" under the *Martin* test. *Cramer*, 338 Mich App at 650 (SHAPIRO, P.J., dissenting).

27

Similarly, the single event of falling from a ladder could never compare to the decades of abuse plaintiff had sustained before the fall.

Under the *Farrington* standard, these factors may still be relevant in considering the totality of the circumstances—but they are only part of the inquiry, not the whole inquiry. *Farrington* requires looking beyond the four rigid factors in *Martin*. The test being set forth today in replacement of *Martin* requires consideration of the factors outlined in this opinion when reviewing the totality of the circumstances, including but not limited to, those provided in *Farrington* and *Lombardi*. However, we do not address today whether plaintiff has met her burden. We instead remand this case to the magistrate to review plaintiff's claims under the clarified *Farrington* standard.

## VI. CONCLUSION

We hold that the *Martin* test (1) conflicts with the plain meaning of MCL 418.301(2) and (2) is at odds with the principle that a preexisting condition is not a bar to eligibility for workers' compensation benefits. For those reasons, we overrule the four-factor test adopted in *Martin*, and we adopt a clarified version of the test set forth in *Farrington* in its place. We therefore vacate the findings of the magistrate, reverse the judgment of the Court of Appeals, and remand this case for further proceedings not inconsistent with this opinion, including a redetermination based on the standard set forth in this opinion and MCL 418.301(2).

Elizabeth T. Clement
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch

28

STATE OF MICHIGAN

SUPREME COURT

AGNES N. CRAMER,

          Plaintiff-Appellant,

v                                                                                    No. 163559

TRANSITIONAL HEALTH SERVICES OF
WAYNE and AMERICAN ZURICH
INSURANCE COMPANY,

          Defendants-Appellees.

_____

ZAHRA, J. (*dissenting*).

While on an aluminum ladder at work, plaintiff touched a damp towel to an open light fixture, causing her to fall to the floor, injuring her shoulder. The Michigan Compensation Appellate Commission (MCAC) affirmed in part and reversed in part the magistrate's decision under the Worker's Disability Compensation Act (MWDCA):[1] the MCAC approved benefits for the treatment of, and wage-loss necessitated by, her shoulder injury,[2] but denied benefits for plaintiff's claim for a mental disability.

The question before this Court is whether the workplace event aggravated plaintiff's mental condition in "a significant manner" as required under MCL 418.301(2). Plaintiff's treating physicians and psychologist, respectively, diagnosed her in neurological terms

---

[1] MCL 418.101 *et seq.*

[2] The MCAC also peremptorily corrected and provided plaintiff an additional period to recover wage-loss benefits. Defendant has not appealed this decision.

with post-traumatic stress disorder, and in psychological terms, with conversion disorder.[3] They believe these disorders account for plaintiff's reporting of non-epileptic seizures (NESs). The diagnoses of these disorders are generally based on a patient's reported history and verified through clinical observation and objective testing. Yet the magistrate and the MCAC rejected much of plaintiff's reported history regarding the workplace incident; indeed, plaintiff's contention that she suffered a severe head injury during the fall was not accepted. Also, plaintiff received extensive clinical observation and significant objective testing, including 12 days of continuous monitoring, but no NES was indicated. To date, not a single medical professional has witnessed plaintiff experience an NES or otherwise objectively verified that plaintiff suffered an NES. Given the dearth of evidence, any reasonable person would question whether plaintiff's alleged claims of NESs are genuine, let alone significant, and thereby question whether she suffers from PTSD or conversion disorder. This alone makes this case a decidedly poor vehicle to consider altering longstanding standards addressing the contribution, aggravation, or acceleration of a preexisting mental disability.

---

[3] "Conversion disorder is a disorder in which a person experiences blindness, paralysis, or other symptoms affecting the nervous system that cannot be explained solely by a physical illness or injury. Symptoms usually begin suddenly after a period of emotional or physical distress or psychological conflict. Conversion disorder is thought to be caused by the body's reaction to a stressful physical or emotional event. Some research has identified potential neurological changes that may be related to symptoms of the disorder. Diagnosis of Conversion disorder is based on identifying particular signs that are common among people with the disorder, as well as performing tests to rule out other causes of the symptoms." Genetic and Rare Diseases Information Center, *Conversion Disorder* <http://rarediseases.info.nih.gov/diseases/6191/conversion-disorder> (accessed July 14, 2023) [https://perma.cc/3SZ8-6H4L].

As such, I believe it to be imprudent to meddle with *Martin v Pontiac Sch Dist*, a unanimous, en banc administrative opinion decided more than 20 years ago.[4] Yet a majority of this Court holds the four-factor test laid out in *Martin* conflicts with MCL 418.301(2) and is at odds with the principle that a preexisting condition is not a bar to the receipt of workers' compensation benefits. In my view, *Martin* is entirely consistent with this Court's caselaw interpretating MCL 418.301(2) and is expressly not at odds with the principle "that a preexisting condition is not a bar to the receipt of workers' compensation benefits." Rather, *Martin* provides sound guidance for determining whether occupational factors contributed in a significant manner to a claimant's existing mental disability.

In addition, I am not persuaded that the majority's addition of factors from *Farrington v Total Petroleum, Inc*,[5] resolves any perceived conflict between *Martin* and the text of MCL 418.301(2) or bolsters the principle "that a preexisting condition is not a bar to the receipt of workers' compensation benefits" any more than *Martin*. The *Farrington* factors are subsumed in the application of the *Martin* factors, and when relevant, are part and parcel of a proper application of the *Martin* test.[6]

---

[4] *Martin v Pontiac Sch Dist*, 2001 Mich ACO 118, lv den 466 Mich 873 (2002).

[5] *Farrington v Total Petroleum, Inc*, 442 Mich 201; 501 NW2d 76 (1993). The *Farrington* factors adopted in the majority opinion are "the temporal proximity of the episodes to the work experience, the physical stress to which the plaintiff was subjected, the conditions of employment, and the repeated return to work after each episode." *Id*. at 221.

[6] The majority embraces the *Martin* factors in its new test as only permissive; yet it is decidedly difficult to imagine an instance in which these factors—" '1) the number of occupational and non-occupational contributors [to the disability], 2) the relative amount of contribution of each contributor, 3) the duration of each contributor, and 4) the extent of permanent effect that resulted from each contributor' "—are not fundamental to the quantitative and qualitative assessment of the workplace event in relation to a preexisting

*Martin* is consistent with MCL 418.301(2). The majority has not cited a single workers' compensation decision that has excluded relevant evidence because it was deemed outside of *Martin*'s four-factor test. To the contrary, many MCAC panels have properly utilized *Martin* for guidance in the interpretation and application of MCL 418.301(2). Given this fact, we ought not overrule *Martin*.

At most, we should clarify and emphasize that *Martin* expressly provides that its four-factor test is not dispositive and that it allows for the consideration of any relevant factors, including the *Farrington* factors if applicable.[7] Thus, there is not much, if any, purpose served by the action taken by the Court in this case. The ultimate determination the majority now requires under MCL 418.301(2) will, in large part, implicitly rest on the *Martin* factors because they are and will remain the most relevant factors to the ultimate determination of a mental disability claim under MCL 418.301(2).

In sum, the majority opinion has not offered any sound basis to overrule *Martin*, which the MCAC has relied on for over 20 years. I would affirm the Court of Appeals' judgment affirming the MCAC's decision, which in turn, affirmed the magistrate's denial of benefits for plaintiff's alleged mental disability. For these reasons and those more fully developed below, I dissent.

---

condition of mental disabilities. *Ante* at 18 (alteration in original), quoting *Martin*, 2001 Mich ACO 118, p 16.

[7] See note 45 of this opinion (listing cases).

## I. APPLICABLE STANDARDS OF REVIEW

The majority opinion's reliance on MCL 418.861a(3) is misplaced because that standard only applies to the MCAC's review of whether the magistrate's factual findings are supported by competent, material, and substantial evidence. Because this case arises from a decision of the MCAC, appellate review is controlled exclusively by MCL 418.861a(14), which provides:

> The findings of fact made by the commission acting within its powers, in the absence of fraud, *shall be conclusive*. The court of appeals and the supreme court shall have the power to review questions of law involved with any final order of the commission, if application is made by the aggrieved party within 30 days after the order by any method permissible under the Michigan court rules. [Emphasis added.]

In *Mudel v Great Atlantic & Pacific Tea Co*,[8] this Court took up "the task of clarifying and definitively setting forth the proper standards of administrative and judicial review, to resolve the confusion [then] existing in the law and to further the efficient administration of worker's compensation cases."[9]

In regard to judicial review, the Court provided an appendix with this basic framework:

> The judiciary treats the WCAC's findings of fact, made within the WCAC's powers, as conclusive absent fraud. If there is *any* evidence supporting the WCAC's factual findings, the judiciary must treat those findings as conclusive. MCL 418.861a(14).

> The judiciary reviews the WCAC's decision, not the magistrate's decision. MCL 418.861a(14).

---

[8] *Mudel v Great Atlantic & Pacific Tea Co*, 462 Mich 691; 614 NW2d 607 (2000).

[9] *Id*. at 696.

> The judicial tendency should be to deny leave to appeal from decisions of the WCAC or, if leave is granted, to affirm, in recognition of the WCAC's expertise in this extremely technical area of law. *Holden v Ford Motor Co*, 439 Mich 257, 269; 484 NW2d 227 (1992).
>
> The judiciary exercises a very narrow scope of review over the WCAC's decisions, designed to ensure that the WCAC did not misapprehend its administrative appellate role in reviewing decisions of the magistrate. *Id*.
>
> The judiciary continues to review questions of law involved in any final order of the WCAC under a de novo standard of review. *DiBenedetto v West Shore Hosp*, 461 Mich 394, 401; 605 NW2d 300 (2000).[10]

The majority opinion's recitation of facts violates the edict of MCL 418.861a(14), as interpreted in *Mudel*, by premising its conclusions on facts that were not accepted by the MCAC.[11] A majority of this Court nonetheless denies that the Court is acting outside the boundaries of MCL 418.861a(14), which expressly authorizes this Court to "review questions of law involved with any final order of the commission[.]" Questions of law, however, are framed by context.[12] And if the context in this case were to frame the question of law under plaintiff's version of the facts, as the majority plainly does, there is no interpretation of MCL 418.301(2) under which plaintiff's claim would be denied. Anyone injured at work by being nearly electrocuted to death and then thrown from the fourth step of a ladder, striking one's head on a sink, then falling to the floor injuring both a shoulder and head again, is all but guaranteed compensation. But MCL 418.861a(14) does not authorize this Court to review de novo the factual assertions of the litigants. Rather, MCL

---

[10] *Mudel*, 462 Mich at 732 (Michigan Statutes Annotated citations omitted).

[11] Application of the erroneous standard of review and the failure to give deference to the factual determinations of the MCAC are reason enough not to meddle with the *Martin* factors.

[12] See, e.g., *2000 Baum Family Trust v Babel*, 488 Mich 136, 143; 793 NW2d 633 (2010).

418.861a(14) provides that "[t]he findings of fact made by the commission acting within its powers . . . *shall be conclusive*." (Emphasis added.) Accordingly, I offer the following factual context, which is consistent with the findings of fact "made by the commission[.]" *Id*.

## II. FINDINGS OF FACTS MADE BY THE COMMISSION

Plaintiff, Agnes Cramer, worked for defendant Transitional Health Services of Wayne, a nursing care facility. On February 8, 2012, plaintiff received an electrical shock arising out of and in the course of her employment with defendant, which precipitated her fall from a ladder and injury to her right shoulder. Plaintiff's husband drove her to Oakwood Annapolis Hospital, where she was assessed, and showing no indications of injury, released. Medical records contained a specific note that plaintiff denied any headaches, dizziness, or visual problems. The records did not reflect that she appeared confused or presented cognitive problems, nor was there any mention of a loss of consciousness. There was no indication that her hand required treatment for an electrical injury. At trial, plaintiff claimed that these medical records were wrong. Yet she also agreed with the hospital's assessment and plan upon discharge, which stated, "after the whole assessment and work up, therefore it appears patient has escaped from any major injury or trauma to herself, [and] will be going home most probably."

Plaintiff returned to work two days later; she claimed to feel dizzy and disoriented and left. Plaintiff claims that she sought an opinion from her family doctor, who allegedly diagnosed her with a concussion. Nonetheless, plaintiff's medical records did not document that plaintiff appeared confused or presented with cognitive problems, nor was

7

there any mention of a loss of consciousness. Plaintiff was referred to the Michigan Institute for Neurological Disorders (MIND). She was first evaluated there on March 7, 2012, where for the first time she reported headaches and cognitive dysfunction stemming from a closed head injury on February 8, 2012. On March 15, 2012, she underwent an EEG, which was normal. On April 16, 2012, plaintiff completed an at-home ambulatory EEG, which was normal. The MCAC found, "During that period of treatment plaintiff underwent a two-day ambulatory home EEG that was interpreted as normal despite plaintiff and her caregiver reporting six seizure events."

Notably, during MIND's evaluation, plaintiff had also gone to the Henry Ford Hospital on April 1, 2012, claiming that she had been experiencing "seizures" since she was "electrocuted" on February 8, 2012, and self-reporting that she had been having persistent twitches. The following day, plaintiff visited Chicago and went to the emergency room at the Alexian Brothers Medical Center in Elk Grove, Illinois, with complaints of seizures. Her test results again were normal, and she did not have any seizure episodes from admission to discharge. She admitted to having two glasses of wine, yet her medical records indicate a very substantial blood-alcohol content of .24%.

After completing her two-day ambulatory, home EEG with MIND on April 16, 2012, which was normal, plaintiff felt it necessary to visit the emergency room at the Garden City Hospital, again claiming that she had suffered seizures. Her test results were again normal, though medical records reflected that she might be having NESs. The records also reflected a blood-alcohol content of .087. She was informed that she should not be drinking alcohol.

On June 25, 2012, plaintiff was admitted to the Henry Ford Epilepsy Monitoring Unit for diagnostic monitoring. No seizures or spells were recorded during two weeks of continuous video-EEG monitoring, including 12 days without antiseizure medications. She was subsequently discharged.

Plaintiff was again seen on July 1, 2014, and reported the February 8, 2012 incident as a "near fatal electrocution." She reported suffering terrible flashbacks when there is thunder and lightning, loud noises, or bright flashing lights. She sought treatment for an injured rib she claimed to have suffered by falling into a fireplace during a seizure two days before. She also reported that her previous husband had physically and emotionally abused her and that after she obtained a divorce, her mother said to her, "You're dead to me now." On July 4, 2014, plaintiff overdosed on prescribed anti-epileptic medications, and medical records reflect that she was feeling lonely and isolated since being abandoned by her family and living apart from her friends in Indiana.

Plaintiff's treating doctors diagnosed her with PTSD from the February 8, 2012 incident and opined that she was suffering from NESs, meaning that her seizures were brought on, not by any physical brain abnormality, but by stress. When questioned about the significance of the February 8, 2012 incident, plaintiff's treatment professionals provided similar responses. The Court of Appeals majority explained in regard to one expert:

> Dr. [Mariana V.] Spanaki-Varalas concluded that plaintiff's accident at work "led to anxiety" and that she therefore "developed [PTSD]." The doctor testified, "The patient had none of those episodes before the insult, and then she progressively developed those up to the point that she had convulsive episodes." Dr. Spanaki-Varalas stated that the workplace incident "was the starting point of [plaintiff's] symptoms" and was a significant factor that led

9

to PTSD and related [NESs]. Dr. Spanaki-Varalas admitted that she was not in the best position to determine the "cause or etiology of what ultimately was [the] diagnosis of PTSD leading to" NESs and that this was best left to other professionals.[13]

As to Andrea J. Thomas, plaintiff's treating psychologist, the Court of Appeals majority observed

> that plaintiff had NESs because they were "diagnosed during her stay in the [epilepsy] unit," and she determined that plaintiff had PTSD by taking plaintiff's history. Thomas said that plaintiff had stressors earlier in her life, but the workplace incident made "the situation that much worse" and contributed to or caused her NESs and PTSD.[14]

Last, as to Dr. Gregory Barkley, the Court of Appeals majority noted he

> stated that plaintiff had been able to cope with "the other things that had happened to her," but the workplace incident "became the straw that broke the camel's back." He admitted that he was relying on plaintiff's provided information in making his conclusions.[15]

Given that NESs can and are often diagnosed based on previous physical, sexual, or mental abuse, defendant sought to prove that the traumatic and stressful events in her personal life were the root cause of her current mental condition.[16] As the Court of Appeals

---

[13] *Cramer v Transitional Health Servs of Wayne*, 338 Mich App 603, 614-614; 980 NW2d 744 (2021) (second, third, and fifth alterations in original).

[14] *Id*. at 615 (alteration in original).

[15] *Id*. at 616.

[16] The majority opinion claims it is unnecessary to focus on plaintiff's various family-related hardships that she experienced before her workplace fall. This is a confounding criticism. After all, this is a claim under MCL 418.301(2), which relates to aggravation of a pre-existing mental condition. And plaintiff did testify that, "what happens when you have a severe trauma in your life, there are things that come flooding back into your head. And it's hard for you to push them away because it's like a dam being burst. Things that were taken care of, resolved, issues that no longer were issues you think about again." While the majority opinion correctly observes that "plaintiff's employment-related

10

majority aptly explained, "plaintiff had an extremely traumatic history, including 19 years of horrific abuse at the hands of her ex-husband. The defense posture was that plaintiff's mental issues stemmed primarily from this history and that plaintiff was also exaggerating her claims of disability."[17]

Defendant provided expert support from Manfred Greiffenstein, a licensed psychologist. The Court of Appeals summarized his testimony as follows:

> Greiffenstein met with plaintiff and conducted a neuropsychological evaluation of plaintiff. Greiffenstein spoke with plaintiff and reviewed several imaging scans. Specifically, Greiffenstein reviewed an MRI of plaintiff's brain that was normal and an EEG that showed no epileptiform activity. Greiffenstein concluded on the basis of plaintiff's medical history that her apparent symptoms "waxed and waned in dramatic fashion," with diagnoses added and dropped accordingly. Plaintiff was having "psychogenic non-epileptic seizures" (PNESs). Greiffenstein stated that such seizures "are usually caused by the intersection of an underlying personality disorder and unusually stressful circumstances." He said that the causes could be in the distant past or "in the here and now." He added, "[T]he theory is that [PNESs] act to control the environment in persons who otherwise have inadequate coping skills." PNESs are "a complex behavior triggered by stress that mimics seizures." Plaintiff had been in a physically and sexually abusive marriage, was still in contact with her ex-husband, was estranged from some of her children, and maintained a contentious relationship with her mother. Accordingly, Greiffenstein found that "the stressors in [plaintiff's] life are not at one time or at [sic] one off event. They are recurrent features of her daily existence."

> Greiffenstein reported that plaintiff "used exaggerated language to describe the symptoms and their functional impact on her life." After administering several tests, Greiffenstein concluded that plaintiff's results

---

complaints began after the accident," her mental disability claim must still be evaluated under all the relevant circumstances. (Emphasis omitted.) Moreover, plaintiff's lack of a previous diagnosis for mental illness does not mean that plaintiff would not have been diagnosed with mental illness had she sought treatment before the workplace event.

[17] *Id*. at 610.

11

were consistent with someone "grossly overstating" disability-related complaints. He noted that plaintiff "did not make the types of errors associated with focal or diffuse brain disease" and stated that, "[b]ased on negative brain scans and a chart history of waxing and waning complaints, the evidence favors histrionic personality" or "Undifferentiated Somatoform Disorder." He said, "This is a form of mental illness characterized by prolific but medically unexplained symptoms, where personality and situational factors are the root cause." Greiffenstein stated that it is difficult to distinguish this illness from "malingering," or faking, and that this difficulty was present in plaintiff's case, because she had presented elements of such faking. Greiffenstein also gave a diagnosis of "conversion disorder." When asked to define this, he stated:

> Conversion disorder is the modern term for what used to be called chronic hysteria, meaning a psychologically disturbed patient whose mental illness takes the form of medically unexplained symptoms. In the case of conversion disorder, the medically unexplained symptoms refer to the central nervous system, meaning they might mimic disorders of the central nervous system but on further medical testing there is no lesion of the central nervous system found. These are typically persons who are histrionic and give colorful and dramatic medical histories that ultimately don't add up or make sense.

Greiffenstein concluded that plaintiff was able to work. He stated, "Mental health services are presently indicated for interpersonal conflict. These are personal problems that pre-date the accident." Greiffenstein said that plaintiff's "symptom claims are best understood as an interaction between a disturbed personality and psychosocial stressor." This personality issue would have been present before plaintiff even began working at Transitional Health Services.[18]

Another defense expert, Dr. Wilbur J. Boike, agreed and stated:

It remains my strong opinion that [plaintiff] has no neurological impairment or disability. So long as her subjective complaints provoke yet evermore evaluation and treatment by medical care providers, it is likely that [plaintiff's] complaints will escalate over time. Given her complaints regarding comments reportedly made to her concerning the possibility of

---

[18] *Cramer*, 338 Mich App at 611-612 (alterations in original).

future "Parkinson's" disease, I would not be at all surprised if this will be the next "presentation" of her "illness."

I strongly recommend that medical care providers discontinue the current practice of reacting to every new symptom as a manifestation of some serious underlying illness. I actually believe [plaintiff's] long-term prognosis is excellent. I believe it is likely that she will completely resolve all of her current "difficulties" once there is resolution of whatever legal proceedings are underway at this time. I do not believe [plaintiff] requires any additional evaluation or treatment of her ongoing complaints.

I strongly doubt that she is actually experiencing headaches at this time.[19]

The magistrate issued a 43-page decision. After a detailed summary of the evidence presented at trial, the magistrate observed that "[t]here was no objective medical testimony that plaintiff sustained a disabling injury to her head, headaches, right hand and wrist." The magistrate concluded that, "[b]ecause *plaintiff's seizures and headaches are unrelated to the incident on February 8, 2012*, [plaintiff] has failed to establish a limitation in her wage earning capacity in work suitable to her qualifications and training." (Emphasis added.)

The magistrate accepted "plaintiff's claim that she injured her shoulder in the fall based in part on the statement by Dr. Greiffenstein that the emergency room records are usually the most accurate records because honesty and self-preservation intersect at that time." Accordingly, the magistrate found that "plaintiff was disabled due to the injury to her right shoulder from the date of the incident on February 8, 2012 through April 12, 2013 . . . ."[20] Plaintiff appealed in the MCAC, which for all intents and purposes, affirmed

---

[19] Comma omitted.

[20] The magistrate found, "There was no evidence that plaintiff made a good faith effort to find employment." Thus, the magistrate rejected plaintiff's disability wage-loss claim.

13

the magistrate's findings on the merits. Plaintiff sought leave to appeal in the Court of Appeals, which entered an order remanding "this matter to the Board of Magistrates for the limited purpose of allowing the magistrate to determine whether plaintiff is entitled to a discretionary award of attorney fees on unpaid medical benefits."[21] The order also stated "[i]n all other regards, the application for leave to appeal is DENIED for lack of merit in the grounds presented."[22]

Plaintiff sought leave to appeal in this Court, and we issued the following order:

> Pursuant to MCR 7.305(H)(1), in lieu of granting leave to appeal, we remand this case to the Court of Appeals for consideration, as on leave granted, of whether: (1) the Michigan Compensation Appellate Commission correctly concluded that the magistrate properly applied the four-factor test in *Martin v Pontiac Sch Dist*, 2001 Mich ACO 118, lv den 466 Mich 873 (2002), and the standard in *Yost v Detroit Board of Education*, 2000 Mich ACO 347, lv den 465 Mich 907 (2001); (2) the *Martin* test is at odds with the principle that a preexisting condition is not a bar to eligibility for workers' compensation benefits and conflicts with the plain meaning of MCL 418.301(2); and (3) the Michigan Compensation Appellate Commission correctly concluded that the magistrate's lack of causation conclusion was supported by the requisite competent, substantial, and material evidence utilizing the proper standard of law. In all other respects, leave to appeal is denied, because we are not persuaded that the remaining question presented should be reviewed by this Court.[23]

---

The MCAC, however, reversed the magistrate's finding in this regard, instead concluding that, "[c]ontrary to the finding of the magistrate, the unrebutted evidence supports a finding that plaintiff did engage in a good faith job search, such that she is entitled to receive wage loss at the stipulated weekly rate of $390.22 from February 8, 2012, through April 12, 2013." These findings are not challenged here.

[21] *Cramer v Transitional Health Servs of Wayne*, unpublished order of the Court of Appeals, entered August 16, 2019 (Docket No. 347806).

[22] *Id*.

[23] *Cramer v Transitional Health Servs of Wayne*, 505 Mich 1022 (2020).

14

On remand, a divided panel of the Court of Appeals affirmed. The Court of Appeals majority first held that "[t]here was evidence to support the MCAC's decision . . . , and no indication that the MCAC somehow misapplied the governing legal standards."[24] The panel majority then held that the MCAC properly reviewed the magistrate's application of *Martin* and *Yost* and "conclude[d] that the MCAC did not err by concluding that the magistrate's conclusions regarding the *Martin* and *Yost* factors were supported by competent, material, and substantial evidence."[25] Last, the majority held:

> We cannot conclude that the *Martin* test conflicts with the plain language of MCL 418.301(2) when it essentially conforms with the Supreme Court's own guidance regarding how to apply that statute—i.e., it provides for a comparison of nonemployment and employment factors. Indeed, analyzing the number of stressors, the relative amount they contribute to a condition, the various stressors' duration, and the extent of the stressors' permanent effect essentially implements the language from *Gardner* [*v Van Buren Pub Sch*, 445 Mich 23; 517 NW2d 1 (1994), overruled on other grounds by *Robertson v DaimlerChrysler Corp*, 465 Mich 732 (2002)] and *Farrington*. A worker with a preexisting illness can obtain benefits as long as an analysis of pertinent factors shows that a work stressor contributed to, aggravated, or accelerated the illness in a significant manner.[26]

The Court of Appeals majority would later add, "[w]hile we do not conclude that there are grounds to overturn *Martin*, we acknowledge that magistrates and the MCAC should always remain cognizant that there can be more than one contributor or group of

---

[24] *Cramer*, 338 Mich App at 628.

[25] *Id*. at 633.

[26] *Id*. at 638-639.

15

contributors affecting a mental disability 'in a significant manner' and that the *Martin* test is only a guide to aid in the fact-finding process."[27]

Plaintiff again sought leave to appeal in this Court. We granted the application and, similarly to our remand order to the Court of Appeals, we directed the parties to address the following:

> (1) whether the four-factor test in *Martin v Pontiac Sch Dist*, 2001 Mich ACO 118, lv den 466 Mich 873 (2002), (a) is at odds with the principle that a preexisting condition is not a bar to eligibility for workers' compensation benefits, and (b) conflicts with the plain meaning of MCL 418.301(2); and (2) assuming that *Martin* provides the appropriate test, the parties shall address whether, on this record, the Court of Appeals erred in affirming the Michigan Compensation Appellate Commission's conclusion that the magistrate properly applied *Martin*, as well as the standard in *Yost v Detroit Bd of Ed*, 2000 Mich ACO 347, lv den 465 Mich 907 (2001).[28]

### III. ANALYSIS

### A. *MARTIN* SHOULD NOT BE DISTURBED

MCL 418.301(2) provides:

> Mental disabilities and conditions of the aging process, including but not limited to heart and cardiovascular conditions and degenerative arthritis, are compensable if contributed to or aggravated or accelerated by the employment in a significant manner. Mental disabilities are compensable if arising out of actual events of employment, not unfounded perceptions thereof, and if the employee's perception of the actual events is reasonably grounded in fact or reality.

To determine whether a workplace event contributed, aggravated, or accelerated a mental disability in "a significant manner," the *Martin* test provides that the fact-finder

---

[27] *Cramer*, 338 Mich App at 643.

[28] *Cramer v Transitional Health Servs of Wayne*, 509 Mich 871 (2022).

consider four non-exclusive factors: "1) the number of occupational and non-occupational contributors [to the disability], 2) the relative amount of contribution of each contributor, 3) the duration of each contributor, and 4) the extent of permanent effect that resulted from each contributor."[29]

The majority criticizes the *Martin* test as it, "in both theory and practice, exhibits bias against finding for plaintiffs and is problematic for three reasons. First, *Martin*'s test does not reflect the statutory language." "Second, as evidenced by the magistrate, the Commission, and the Court of Appeals panel here, *Martin* is being treated as a bright-line test, as opposed to the 'guide' it was intended to be." And third, "the limited factors themselves often tip the scales in favor of noncompensability."[30]

None of the majority's criticisms of *Martin* is compelling. The majority's first criticism relies almost exclusively on an MCAC panel's divided opinion in *Taig v Gen Motors Corp*,[31] which declined to rely on *Martin*, asserting that it "creates a legal standard far a field [sic] from the one envisioned by MCL 418.301(2)." The *Taig* majority's view of *Martin* is highly flawed, not only because it reads *Martin* with a jaundiced eye, but because its understanding of MCL 418.301(2) is directly contrary to this Court's decisions in *Farrington* and *Gardner*. *Taig*'s majority asserted that "if the employee's (here, emotional) condition is aggravated 'in a significant manner' by the conditions of

---

[29] *Martin*, 2001 Mich ACO 118, p 16.

[30] In discussing *Martin*'s factors, the majority opinion concludes that "[f]actors one and three are most problematic and inherently biased against plaintiffs."

[31] *Taig v Gen Motors Corp*, 2006 Mich ACO 134, p 11.

17

employment to produce an injury, nothing in MCL 418.301(2) allows the identification of some other factor, even if non-work-related and even if significant, to refute the causal connection."[32] This is simply not true: *Farrington* stated that an "injury must be significantly caused or aggravated by employment considering the totality of all the occupational factors and the claimant's health circumstances *and nonoccupational factors*."[33] Indeed, *Farrington* noted that nonoccupational factors relevant to a preexisting heart condition, include, for example, age, weight, diet, previous cardiac ailments or injuries, genetic predispositions, and the claimant's consumption of alcohol and use of tobacco or other drugs.[34] Likewise, *Gardner* expressly states that "[t]he analysis [under MCL 418.301(2)] must focus on whether actual events of employment affected the mental health of the claimant in a significant manner. This analysis will, by necessity, require a comparison of nonemployment and employment factors."[35] This comports with basic common sense: to decide whether the injury's contribution was significant, one must also consider the significance of other contributing factors. For this reason alone, the *Taig* opinion is poorly reasoned and should be rejected.

But there are more reasons to disregard the majority opinion in *Taig*, which also criticizes *Martin* over concerns that a "pre-existing condition will always place a figurative

---

[32] *Id*. at pp 11-12.

[33] *Farrington*, 442 Mich at 216-217 (emphasis added).

[34] *Farrington*, 442 Mich at 217 n 17 (quotation marks omitted).

[35] *Gardner*, 445 Mich at 47.

finger on the scale and militate against a conclusion of work relationship."[36]  This is *precisely* how the Legislature intended MCL 418.301(2) to operate, which is why MCL 418.301(2) requires a significant work contribution in this class of cases as opposed to all other classes of cases requiring any work contribution.  While *Taig*'s majority apparently disagrees with MCL 418.301(2) as a policy, policy-making is primarily a legislative function.  Here, the language of MCL 418.301(2) couldn't be clearer.  The Legislature made it more difficult for claimants to recover for, among other types of claims, mental disabilities.

The *Taig* majority opinion then claimed that "*Martin* substitutes for an analysis of the record a default rule that a 'subjectively significant event' cannot constitute a legally significant contribution."[37]  Even if that claim had any merit in 2006 when *Taig* was decided (which it did not) and held true for a period of time, the Legislature amended MCL 418.301(2) in 2011[38] to mandate that which was already obvious: requiring that an "employee's perception of the actual events is reasonably grounded in fact or reality."  By law, *Taig*'s so-called "subjectively significant event" is no longer a sustainable claim when contribution to a preexisting mental disability lacks objective proof that the event is significant.  *Taig* was never sound, likely prompting the Legislature to later amend the statute, in part, to put an end to claims solely based on a "subjectively significant event."

---

[36] *Taig*, 2006 Mich ACO 134, p 12.

[37] *Taig*, 2006 Mich ACO 134, p 12.

[38] MCL 418.301, as amended by 2011 PA 266.

A majority of this Court also clings to another misguided criticism of *Martin* from *Taig*, which asserted:

> [I]f the work-related conditions are found not to have aggravated the condition "in a significant manner" because some other condition is more significant, this is legal error because it alters the legislative scheme of "in a significant manner" into requiring the employment conditions be "the most significant" cause of the injury before it will be found to be compensable. This is precisely the kind of shift in policy that is not the role of the administrative agency to make.[39]

This claim is wholly flawed. *Martin* does not hold that a more-significant nonoccupational condition precludes an occupational condition from aggravating a preexisting mental disability in a significant manner. Rather, *Martin* rejected this assertion by likening its "evaluation to Judge Learned Hand's explanation in *United States v Carroll Towing*, 159 F2d 169 ([CA 2,] 1947), which defined 'reasonable conduct' as that which produces a burden of alternative conduct greater than the product of the probability and gravity of its detrimental consequences."[40] *Martin* explained that its evaluation "defies mathematic calculation."[41] *Martin* then elaborated on this point, borrowing from *Scott v Broder Bros Co, Inc*:[42]

> "If, as a matter of objective fact, a workplace event is a significant contributor to a claimant's mental disability, such disability is compensable, even if the same event would have had little or no impact on an ordinary or reasonable person.

---

[39] *Taig*, 2006 Mich ACO 134, p 13.

[40] *Martin*, 2001 Mich ACO 118, p 12.

[41] *Id*.

[42] *Scott v Broder Bros Co, Inc*, 1999 Mich ACO 234.

It is for this reason that pre-existing frailties cannot act *as a bar* to recovery. A pre-existing condition which makes a claimant more susceptible to mental injury does not act as a bar to benefit entitlement if workplace injury causes the claimant to become disabled. *Corbett v Charter Township of Plymouth* . . . .[43] It is entirely possible that an employee with pre-existing mental complaints might become mentally disabled because of a workplace event that, for this particular employee, was so weighty as to become a significant source of the mental disability. But there is an enormous difference between saying that a pre-existing frailty cannot act as a bar to recovery, and saying that it should not be considered."[44]

This explanation refutes any assertion that *Martin* interpreted the phrase "in a significant manner" to be understood as "the most significant manner."[45]

---

[43] *Corbett v Plymouth Charter Twp*, 453 Mich 522; 556 NW2d 478 (1996).

[44] *Martin*, 2001 Mich ACO 118, p 14 n 15, quoting *Scott*, 1999 Mich ACO 234, p 8.

[45] Many MCAC decisions also refute this assertion, and many of these decisions consider the temporal proximity of the episodes to the work experience. *Yahia v Omega Indus, Inc*, 2005 Mich ACO 80, pp 3, 11 (affirming an open award for mental disability, stating, "Aided by the magistrate's *Martin* review, we are convinced that his decision pertaining to psychiatric disability is supported by competent, material and substantial evidence on the whole record" and agreeing with the magistrate that plaintiff's loss of custody of his child from a previous marriage was a significant nonwork-related factor); *Traylor v Wayne Co*, 2005 Mich ACO 109, p 2 (affirming a closed award for mental disability and the magistrate's conclusion " 'that several factors, both work and non-work, contributed to [p]laintiff's mental injury: her daily exposure to the police, the courts and crime being the work connection; her pre-existing personality disorders, her prior treatment, her past traumatic experiences (possible rape/possible suicide attempt) and, most importantly, the murder/suicide of her sister/brother-in law being the out-of-work factors. Numerically, one in four, 25%, batting average of .250, which I consider a significant percentage.' "); *Borah v Whirlpool Corp*, 2002 Mich ACO 241, p 3 (affirming an open award for a workplace-stress-related claim of mental disability, despite finding it significant that "plaintiff was biologically set up to suffer substantial depressive reactions to negative events. Plaintiff's severely dysfunctional family (parental/sibling) and history of prior depression and mental treatment, indicate such predisposition"); *Dawkins v Wal Mart Assoc, Inc*, 2006 Mich ACO 322, p 3 (affirming a closed award for mental disability based on a single major depression episode among numerous nonoccupational contributing stressors, including caring for her disabled husband, issues with her daughter, son, and mother, and the death of an infant granddaughter); *McKinney-Prude v Detroit Bd of Ed*, 2008 Mich ACO 137, p 7 (affirming an award for mental disability, concluding that "the

The majority opinion next claims *Martin* is being treated as a bright-line test, as opposed to the "guide" it was intended to be. But it is far from clear that this is indeed the case. The language of *Martin* made clear:

> [W]e avoid creating a bright-line test or checklist. Instead, we propose factors which concentrate the analysis on the fundamental evidence regarding increased contribution. We prefer factors because factors differ from elements. Each element requires a preponderance of proof. Factors do not require such proof. Rather, overwhelming proofs regarding one factor can overcome the absence of proof regarding another factor.[46]

It is true that *Martin* later said in its decision that "we have adopted a definition for significant contribution that can be satisfied *only* when a four-factor test is met."[47] But this single, then-unnecessary and now-unfortunate, mention of the word "only" viewed in

---

magistrate balanced the work-related factors and the non-work-related factors and concluded that plaintiff's mental disability had been precipitated 'in a significant manner' by the injury at work" and noting that "the record does not establish that [a traumatic auto accident involving a significant head injury that] occurred in 1982 was part of a work-related journey"); *Raguckas v Mich Dep't of Corrections* 2009 Mich ACO 82, pp 7-8 (affirming a magistrate's award for mental disability in *Martin Raguckas v Mich Dep't of Corrections*, Workers' Compensation Agency Board of Magistrates Opinion (October 2, 2006), p 17, available at <https://adms.apps.lara.state.mi.us/File/ViewDmsDocument/10224>, in which the magistrate expressly stated that "the stressors at work occurred in close proximity of plaintiff being diagnosed with anxiety"); *Berg v Whirlpool Corp, Inc*, 2003 Mich ACO 39, p 6 (affirming an award for mental disability despite evidence of a longstanding " 'propensity to depression' "); *Vicks v DaimlerChrysler Corp*, 2005 Mich ACO 133 pp 2-3 (affirming an award " 'based on application of the four <u>Martin</u> factors,' " with the magistrate stating, " 'although Dr. Mercier believes plaintiff being abused as a four-year-old child has had a great impact on plaintiff, I find that it and her other nonoccupational contributors have not contributed too much to plaintiff's major depression since she had coped many years without having major depression until she was transferred to Chelsea and began experiencing work-related difficulties' ").

[46] *Martin*, 2001 Mich ACO 118, p 12.

[47] *Id*. at pp 14-15 (emphasis added).

hindsight from a lengthy en banc agency decision does not plausibly negate that which *Martin* had previously made clear: the factors are not intended to create a rigid test.

Martin has never precluded the consideration of evidence "in addition to medical testimony, [relating to] 'potentially *significant* factors in the causal equation,' " including: "the temporal proximity of the [injury] to the work experience, the physical stress to which the plaintiff was subjected, the conditions of employment, and the repeated return to work after each episode."[48] *Farrington* recognized that the crux of *Martin* turned on the Legislature's hope that, "[a]fter the enactment of the 'significant manner' amendments, [applicable] occupational factors must now be considered together with the totality of claimant's health circumstances to analyze whether the [health condition] was significantly caused by work-related events."[49] *Martin* maintained that in workers' compensation proceedings, "the totality of claimant's health circumstances [must be examined to determine] whether the [plaintiff's disability] was significantly caused by work-related events."[50]

---

[48] *Farrington*, 442 Mich at 221, quoting *Kostamo v Marquette Iron Mining Co*, 405 Mich 105, 131; 274 NW2d 411 (1979).

[49] *Farrington*, 442 Mich at 221-222. Oddly, the same criticism the majority lodges against *Martin* in terms of "contradiction" can as easily be lodged at *Farrington*: *Farrington* listed *potential* factors in the opinion and later stated that the same *potential* factors *must* be addressed. This minor discrepancy does not suggest the totality of the circumstances can be ignored. Rather, a reasonable reading of *Farrington* is that all applicable factors must be addressed.

[50] *Martin*, 2001 Mich ACO 118, p 7.

I find puzzling that the majority opinion cites cases that simply reiterate the point the Court of Appeals' majority made clear: *Martin* is not a bright-line test.[51] Even more confounding is plaintiff counsel's understanding of *Martin*. At argument, plaintiff's counsel engaged in the following colloquy:

> *Justice VIVIANO*: I mean there is no case that says, if there is four outside contributors and one, one, workplace contributing factor, that's enough, is there? Is there any case that holds that?
>
> *Roger Kline* [*plaintiff's counsel*]: Did you say four outside and one at work, . . . well that's what *Martin* says.
>
> *Justice VIVIANO*: So *Martin* says just count and if the count is more outside than inside then the analysis is over? That's your, that's your interpretation of *Martin*?
>
> [*Plaintiff's counsel*]: Yeah.
>
> *Justice VIVIANO*: Really?
>
> [*Plaintiff's counsel*]: Yeah that's my interpretation.
>
> *Justice VIVIANO*: So, when *Martin* says look at all these other factors, look at factors we didn't list, no factor alone is conclusive. No, it didn't mean any of those things, it only meant count them and if the accounting is more outside than inside you're done.
>
> [*Plaintiff's counsel*]: That's how I read it.

If the understanding of plaintiff's counsel were correct, I would agree that *Martin* is a bright-line test, which I understand to mean "[a] legal rule of decision that tends to resolve issues, esp. ambiguities, simply and straightforwardly, sometimes sacrificing equity for

---

[51] *Bolden v DaimlerChrysler Corp*, 2006 Mich ACO 170, p 7; *Dortch v Yellow Transp, Inc*, 2007 Mich ACO 21, p 4; *Jones-Stott v Henry Ford Hosp*, 2007 Mich ACO 31, p 6.

certainty."[52]  But the argument of plaintiff's counsel that *Martin* only requires a tally of factors cannot be taken seriously.  Over the past 20 years, *Martin* has only once been called into question by the MCAC, in *Taig*, a divided agency opinion.  This single case does not support the false narrative that has been suggested, which the majority opinion accepts without proof, that some magistrates arbitrarily apply *Martin* while others do not.[53]  Even if true, overruling *Martin* is clearly not a measured response when this Court can simply reiterate, as the Court of Appeals did, that *Martin* is not a bright-line test.  The only aspect of the majority opinion that suggests an improper bright-line test is the notion of a workplace event that amounts to the "straw that broke the camel's back."  I agree that this metaphorical approach is often inapt because it suggests the workplace event was a minor or trivial event, which may or may not be the case.  Yet *Yost* makes clear that the weight of the workplace event must be evaluated, regardless of whether a plaintiff's expert mentions the metaphor and the likelihood that a defendant will then rely on the metaphor to argue that the workplace event was not significant.[54]  This aspect of *Yost*, however, is not implicated in this case.  The magistrate here did not "apply" a "last event" analysis and

---

[52] *Black's Law Dictionary* (11th ed), p 1594 (defining "bright-line rule").

[53] Indeed, while the majority makes many empirical assertions about how the factors work in practice, it provides no citations or other proof to support the assertions.  See, e.g., *ante* at 22 (stating, without citation, that "the limited factors themselves often tip the scales in favor of noncompensability"); *ante* at 24 (stating, without attribution or citation to authority, "Like the first, [the third] factor tends to generate findings of noncompensability any time a plaintiff suffers from a longstanding preexisting condition.").

[54] *Yost*, 2000 Mich ACO 347, p 2.

instead criticized plaintiff's expert because he introduced the metaphor yet refused to consider the weight of the nonoccupational factors. In other words, the magistrate understood the obligation requires an assessment of "the relative amount of contribution of each contributor[.]"[55] The magistrate stated:

> There was no testimony that Dr. Barkley, Dr. Spanaki-Varalas and Ms. Thomas attempted to quantify the stressors from the work incident to the other stressors in plaintiff's life. Ms. Thomas said plaintiff's post-traumatic stress disorder and conversion disorder was significantly caused or contributed to by the accident at her workplace; however she appeared to contribute little significance to plaintiff's non-occupational stressors. Ms. Thomas merely stated plaintiff had some issues earlier in her life but she was doing fairly well with everything prior to the workplace incident.

> Dr. Barkley made no comparison between plaintiff's occupational and non-occupational stressors. He said plaintiff had various traumatic experiences in life and had been able to cope with the other things that had happened to her but the work injury was the straw that broke the camel's back. It was Dr. Barkley's opinion that the fact that plaintiff did not have the [symptoms] before the injury and now has them appears to be causally related.

> Dr. Spanaki-Varalas also did not make a comparison between plaintiff's occupational and non-occupational stressors. Dr. Spanaki-Varalas said the injury brought up or maximized plaintiff's previous stressors. She said plaintiff had stressors but she was coping relatively well until the electrical shock and the fall.

> Dr. Barkley, Dr. Spanaki-Varalas and Ms. Thomas all said the incident of February 8, 2012 caused plaintiff's post-traumatic stress disorder and conversion disorder. They did not compare the non-occupational stressors to the occupational stressors in plaintiff's life to determine which stressors were the more substantive contributors.

---

[55] *Martin*, 2001 Mich ACO 118, p 16.

The MCAC did not commit error by accepting the magistrate's determination that plaintiff's expert improperly relied on a "straw that broke the camel's back" analysis. None of the majority's criticisms of *Martin* is sound, and *Martin* should be retained.

## B. THE NEW TEST ADOPTED BY THIS COURT IS UNECCESSARY AND NOT HELPFUL

The majority opinion concludes:

> Under the *Farrington* standard, [the *Martin*] factors may still be relevant in considering the totality of the circumstances—but they are only part of the inquiry, not the whole inquiry. *Farrington* requires looking beyond the four rigid factors in *Martin*. The test being set forth today in replacement of *Martin* requires consideration of the factors outlined in this opinion when reviewing the totality of the circumstances, including but not limited to, those provided in *Farrington* and *Lombardi* [*v William Beaumont Hosp (On Remand)*, 199 Mich App 428; 502 NW2d 736 (1993)].

The majority in essence improperly criticizes the *Martin* factors only to permit those same factors in its new test.[56] The same reasons that the majority has criticized the *Martin* factors will be the same reasons that later claimants will rely on to challenge the *Farrington* standard. And *Martin* explicitly allows the consideration of the *Farrington* factors. The new test, therefore, is not necessary.

Moreover, *Farrington* is a case involving a heart attack while *Martin* is a case that only considered mental disability. Apparently—and without much, if any, explanation— the majority asserts that the addition of the *Farrington* factors will be helpful. This is an odd assertion given that the *Farrington* factors were not drawn from a mental disability

---

[56] The majority opinion expressly denies criticizing the *Martin* factors, yet states that *Martin* "[f]actors one and three are most problematic and inherently biased against plaintiffs."

claim. Instead, they were first drawn from *Kostamo v Marquette Iron Mining Co*, a 1979 decision of this Court that, like *Farrington*, addressed a heart attack claim,[57] in which focus on "the temporal proximity of the . . . episodes to the work experience, the physical stress to which the plaintiff was subjected, the conditions of employment, and the repeated return to work after each episode,"[58] and consideration of these factors in a physical injury case makes sense.[59] But as applied to claims of mental disability cases, the majority's resolution will only create confusion by requiring the consideration of factors that, like in this case, are not particularly relevant to a mental disability claim. The majority's new test does not resolve any inconsistency. Rather, the majority simply applies an ineffective Band-Aid that obscures the inconsistency the majority wrongly believes existed under the *Martin* test.

Likewise, I am not persuaded that addition of the *Farrington* factors bolsters the proposition "that a preexisting condition is not a bar to the receipt of workers' compensation benefits" any more than *Martin*. Given that *Martin* plainly provides that its four-factor test is not exclusive and allows for the consideration of any relevant factors, including the *Farrington* factors if applicable, there is not much, if any, purpose served by the majority's opinion. The ultimate determination this Court now requires under MCL 418.301(2) still rests on the *Martin* factors because they are, and will remain, the most relevant factors to the ultimate determination of a mental disability claim under MCL

---

[57] *Kostamo*, 405 Mich 105.

[58] *Farrington*, 422 Mich at 221.

[59] *Farrington* omitted mention of "mental stress," which *Kostamo* considered an important factor. *Kostamo*, 405 Mich at 131.

418.301(2). In contrast, in most mental disability cases, the *Farrington* factors will still be viewed as peripheral, at best supplementing the *Martin* factors because, like in this case, the *Farrington* factors are not highly relevant.

Amicus AF Group draws our attention to a far better list of relevant factors (set forth by the Mayo Clinic), all or any of which *Martin* allows to be considered in a mental disability case:

> Mental illnesses, in general, are thought to be caused by a variety of genetic and environmental factors:
>
> - **Inherited traits.** Mental illness is more common in people whose blood relatives also have a mental illness. Certain genes may increase your risk of developing a mental illness, and your life situation may trigger it.
>
> - **Environmental exposures before birth.** Exposure to environmental stressors, inflammatory conditions, toxins, alcohol or drugs while in the womb can sometimes be linked to mental illness.
>
> - **Brain chemistry.** Neurotransmitters are naturally occurring brain chemicals that carry signals to other parts of your brain and body. When the neural networks involving these chemicals are impaired, the function of nerve receptors and nerve systems change, leading to depression and other emotional disorders.
>
> \* \* \*
>
> Certain factors may increase your risk of developing a mental illness, including:
>
> - A history of mental illness in a blood relative, such as a parent or sibling
>
> - Stressful life situations, such as financial problems, a loved one's death or a divorce
>
> - An ongoing (chronic) medical condition, such as diabetes

- Brain damage as a result of a serious injury (traumatic brain injury), such as a violent blow to the head

- Traumatic experiences, such as military combat or assault

- Use of alcohol or recreational drugs

- A childhood history of abuse or neglect

- Few friends or few healthy relationships

- A previous mental illness[60]

These factors are relevant to evaluating a stress-related mental disability claim. In this case, many of these nonoccupational factors are clearly present in the record, including plaintiff's share of stressful life situations (a contentious divorce, estrangement from children, abandonment by a parent); use of alcohol; history of physical, sexual, and mental abuse; and few friends after moving to another state. Even accepting plaintiff's testimony that she has been happily married for five years, common experience dictates that these factors do not simply dissipate, especially given that most of the factors are clearly ongoing. So, as the majority opinion emphasizes, consideration of the temporal proximity of mental injury to the work experience is relevant in this case, but it is not remotely dispositive given these ongoing stressors. Very few people simply "get over" the stress of a contentious divorce that results in a loss of custody and continued estrangement from their children and a parent. And since plaintiff relocated, she is no longer in regular contact with friends who might be able to help her cope with these ongoing factors. Under these circumstances, it is entirely appropriate that defendant would argue that plaintiff falsely or

---

[60] Mayo Clinic, *Mental Illness*, <https://www.mayoclinic.org/diseases-conditions/mental-illness/symptoms-causes/syc-20374968> (accessed July 16, 2023).

mistakenly attributes all of her perceived problems to the February 8, 2012 workplace incident. And none of the majority's other proposed factors, as set forth in *Farrington*[61]— the physical stress to which the plaintiff was subjected, the conditions of employment, and the repeated return to work after each episode—are relevant.

In sum, the majority's new test is unnecessary, unhelpful, and should be rejected.

## C. THE UNDERLYING DECISION SHOULD BE AFFIRMED AND A REMAND IS UNECCESSARY

The MCAC specified that "on February 8, 2012, plaintiff received an electrical shock arising out of and in the course of her employment with defendant which precipitated her fall from a ladder and injury to her right shoulder." Reviewing courts must accept this factual conclusion if there is evidence in the record to support this finding. And more than ample evidence supports this finding. As mentioned, plaintiff was treated shortly after the February 8, 2012 incident at the Oakwood Annapolis Hospital, where she was assessed and, showing no indications of injury, released. Medical records contained a specific note that plaintiff denied any headaches, dizziness, or visual problems. The records did not reflect that she appeared confused or presented cognitive problems, nor was there any mention of a loss of consciousness.

Other than plaintiff's allegations, no evidence has been presented that plaintiff was injured at work from a fall hurting her head. Certainly, there is no evidence to support her claims that she was nearly electrocuted to death by a light fixture, was thrown off a ladder, first striking her head on a kitchen sink, and then somehow landed on the kitchen floor, not

---

[61] *Farrington*, 442 Mich at 221.

only hurting her shoulder but also striking her head a second time. Clearly, had plaintiff arrived at the hospital after having suffered those injuries, there would be *some* indication of a head injury in the medical records. To the contrary, the hospital's assessment and plan upon discharge stated, "after the whole assessment and work up, therefore it appears patient has escaped from any major injury or trauma to herself, will be going home most probably." Plaintiff agreed with this document and later affirmed her agreement with the document during her trial testimony.

Moreover, plaintiff's own testimony at trial, if true, shows how her perception that she received a head injury may not have been grounded in reality. Plaintiff testified there were other people standing around, one saying, "[O]h my god, are you okay?" Another, plaintiff stated, "just stood there with her eyes as wide as wide could be." Plaintiff stated that "[t]hey were the ones that told me what happened because I did lose consciousness at the time I got thrown. When I hit my head the second time I came to." Plaintiff even claimed her supervisor told the two witnesses "to go and write up an accident report." Plaintiff also testified that "Carol, who is one of the nurses, came in and took my blood pressure." Plaintiff presented none of these witnesses. At the very least, plaintiff should have provided some evidence from her supervisor confirming the existence of the two witnesses to corroborate that she hit her head.

Yet the majority opinion, contrary to our legislative directive on adopting the factual findings of the MCAC, inexplicably adopts plaintiff's fanciful narrative of her workplace injury and ignores the circumstances surrounding plaintiff's immediate treatment for the injury. Looking at the entire record, a clear theme emerges in that plaintiff repeatedly seeks treatment and emergency services for NESs that she unreasonably believes are related to

32

the February 8, 2012 workplace incident. No one, other than her current husband, has ever witnessed her alleged NESs, despite trained professionals in a clinical setting looking for any indication of NESs, including during a two-week period of continuous monitoring. Given plaintiff's claim of experiencing NESs on a regular basis before the evaluation, one would expect at least one confirmed event during that period. Yet during the evaluation, plaintiff reported six seizures by pushing a button when she thought she was experiencing a seizure. All six of her claimed seizures were false. Her objective brain-wave testing did not show that she had experienced any indication of NESs during the evaluation, let alone any of the six times she claimed to suffer NESs.

Basically, plaintiff has presented a marginal claim that would only support a conditional change from asymptomatic to symptomatic, which "does not equate with significant contribution."[62] Likewise, "[j]ust because a claimant was functional before the workplace event and then becomes disabled after the event does not make the event significant."[63]

A remand in this case is unnecessary for the same reasons that *Yost* declined to remand to the magistrate. In this case, plaintiff experts' testimony "is even more generally flawed by the fact that [they] attributed importance to the workplace event in a strictly isolated theoretical setting [and they] assigned impact to the event at work based upon a faulty medical history."[64] Like *Yost*, there is an "absence of any competent, material and

---

[62] *Yost*, 2000 Mich ACO 347, p 2 n 2.

[63] *Id*.

[64] *Id*. at p 5 (sentence structure omitted).

substantial evidence on the whole record to support [a] finding of significant contribution . . . ."[65] Given the unlikelihood that plaintiff can establish her claim under the majority's new test, I would not remand for further proceedings and, instead, would affirm the denial of plaintiff's mental disability claim.

## IV. CONCLUSION

The majority's opinion unnecessarily and improperly disturbs *Martin* only to require additional factors be considered that are not very relevant to mental disability claims under MCL 418.301(2). I would affirm the Court of Appeals' judgment affirming the MCAC's decision, which, in turn, affirmed the magistrate's denial of benefits for plaintiff's alleged mental disability.

Brian K. Zahra
David F. Viviano

BOLDEN, J., did not participate in the disposition of this case because the Court considered it before she assumed office.

---

[65] *Id*. at p 3 n 4.